Steven T. Lovett, OSB No. 910701
steve.lovett@stoel.com
Rachel C. Lee, OSB No. 102944
rachel.lee@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380
Facsimile:   503.220.2480

Daniel F. Katz (*pro hac vice*)
dkatz@wc.com
David S. Kurtzer-Ellenbogen (*pro hac vice*)
dkurtzer@wc.com
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  202.434.5000
Facsimile:   202.434.5029

Attorneys for Defendant Intel Corporation

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| In re INTEL CORP. CPU MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No.:  3:18-md-2828-SI |
| This Document Relates to All Actions | DEFENDANT INTEL CORPORATION'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 9(b) AND 12(b)(6)<br><br>*Oral Argument Requested* |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

LR 7-1 CERTIFICATION .................................................................................. 1

MOTION............................................................................................................ 1

LEGAL MEMORANDUM ................................................................................ 1

INTRODUCTION .............................................................................................. 1

FACTS ............................................................................................................... 4

    A.    Performance and Security in Modern CPUs....................................... 4

    B.    The "Intel CPU Exploits" ................................................................. 5

    C.    Intel's Compliance with Responsible Disclosure Practices.................... 8

    D.    The Mitigations................................................................................. 9

    E.    Intel's Marketing Statements ............................................................ 9

    F.    The Named Plaintiffs ...................................................................... 10

    G.    Plaintiffs' Allegations Remain Indistinguishable from *Hauck*. ........... 11

STANDARD OF REVIEW ............................................................................... 12

ARGUMENT .................................................................................................... 13

I.    PLAINTIFFS FAIL TO STATE A NATIONWIDE UCL CLAIM (COUNT I). ............. 13

    A.    Plaintiffs Have Not Identified Any Material Omission. ....................... 14

        1.    Either Both Defects Were Publicly Known or Intel Had No Knowledge of Them—Plaintiffs' Claim Fails Either Way...................... 15

            a.    Plaintiffs Have Failed to Retract Their Prior and Dispositive Admissions that Both Defects Were Public Knowledge. ..................... 15

        b.    Alternatively, Plaintiffs' Retraction of Allegations as to *Industry* Knowledge of the Defects Would Preclude Any Claim as to *Intel's* Knowledge .......................................20

        c.    Intel's Alleged Conduct After Learning of *the Intel CPU Exploits* Is Irrelevant to a UCL Claim Based on Omission of *the Defects*. ...............................................21

    2.  *Hauck* Confirms That Plaintiffs' Fraud-by-Hindsight Theory Fails To Satisfy Any of the *LiMandri* Factors or the Materiality Requirement. ..............................................23

        a.    Plaintiffs Have Failed to Allege Any of the *LiMandri* Factors Necessary To Support Their UCL Theory. .......................24

        b.    Plaintiffs Fail to Allege that Any Omissions Were Material to Reasonable Consumers. ............................27

  B.    Plaintiffs Have Not Otherwise Alleged Unfair Trade Practices. ...........................29

    1.  *Hauck* Supports Dismissal of Any UCL Claim Premised on Intel's Design Choices. .........................................30

    2.  California Law Similarly Bars Any Unfair Design Choice Theory. .........31

II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT (COUNT II). ..................................................33

III.   THE COURT SHOULD AGAIN DISMISS COUNTS I AND II UNDER *SONNER* BECAUSE PLAINTIFFS HAVE AN ADEQUATE LEGAL REMEDY ..............................................................35

  A.    Plaintiffs Cannot Evade Application of *Sonner* Through Speculation or Alleged Uncertainty as to Their Legal Claims. ...................................36

  B.    *Sonner* Applies Because Plaintiffs' Legal and Equitable Claims Rest on the Same Facts and Same Legal Theories, and Seek the Same Relief. ................37

  C.    Plaintiffs' Request for Injunctive Relief Under the UCL Does Not Salvage Their Equitable Claims. ..........................................39

  D.    Plaintiffs Cannot Use Equitable Remedies to Salvage Lost Legal Claims...........41

IV.   PLAINTIFFS FAIL TO STATE ANY BELLWETHER CLAIM. ...................................42

  A.    Plaintiffs Do Not State a Bellwether Omissions Claim. ........................................43

B.      Plaintiffs Do Not State a Bellwether Affirmative Misrepresentation Claim. ........45

C.      Plaintiffs State No Bellwether "Unfair" or "Unconscionable" Claim. .................47

CONCLUSION ......................................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Adams v. Cole Haan, LLC*, 2020 WL 5648605 (C.D. Cal. Sept. 3, 2020) ...............................39, 40

*Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595 (9th Cir. 2014) ................................................................................................................................18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .........................................................................................12

*Barrett v. Apple Inc.*, 2021 WL 827235 (N.D. Cal. Mar. 4, 2021) ...............................................36

*Barrett-O'Neill v. LALO, LLC*, 171 F. Supp. 3d 725 (S.D. Ohio 2016) .......................................49

*Batson v. Live Nation Ent., Inc.*, 746 F.3d 827 (7th Cir. 2014) ....................................................48

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................12

*Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531 (9th Cir. 2016) ....................................38

*Bullseye Glass Co. v. Brown*, 2019 WL 8323619 (D. Or. Jan. 22, 2019) ....................................18

*Clark v. Am. Honda Motor Co.*, 2021 WL 1186338 (C.D. Cal. Mar. 25, 2021) ....................36, 39

*Clark v. Eddie Bauer LLC*, 2021 WL 1222521 (W.D. Wash. Apr. 1, 2021) ................................38

*Coffey v. WCW & Air, Inc.*, 2020 WL 3250744 (N.D. Fla. Mar. 25, 2020) .................................48

*Daniel v. Ford Motor Co.*, 806 F.3d 1217 (9th Cir. 2015) ...........................................................27

*Davis v. HSBC Bank Nev. N.A.*, 691 F.3d 1152 (9th Cir. 2012) ...................................................13

*Drake v. Toyota Motor Corp.*, 2021 WL 2024860 (C.D. Cal. May 17, 2021) ........................36, 39

*Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843 (N.D. Cal. 2012) .........................................14

*Falk v. GMC*, 496 F. Supp. 2d 1088 (N.D. Cal. 2007), *aff'd*, 322 F. App'x 489 (9th Cir. 2009) ......................................................................................................................................29

*Franckowiak v. Scenario Cockram USA, Inc.*, 2020 WL 9071697 (C.D. Cal. Nov. 30, 2020) ......................................................................................................................................42

*Garcia v. Sony Computer Ent. Am., LLC*, 859 F. Supp. 2d 1056 (N.D. Cal. 2012) ....................26

*Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044 (N.D. Cal. 2016) ........................................18, 19

*Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011 (C.D. Cal. 2015) ...............................9

*Gibson v. Jaguar Land Rover N. Am., LLC*, 2020 WL 5492990 (C.D. Cal. Sept. 9, 2020)..........38

*Guzman v. Polaris Indus. Inc.*, 2021 WL 2021454 (C.D. Cal. May 12, 2021) .............................41

*Hassell v. Uber Techs., Inc.*, 2020 WL 7173218 (N.D. Cal. Dec. 7, 2020) ..................................35

*Hauck v. Advanced Micro Devices, Inc.*, 2018 WL 5729234 (N.D. Cal. Oct. 29, 2018) ...............9

*Hauck v. Advanced Micro Devices, Inc.*, 2019 WL 1493356 (N.D. Cal. Apr. 4, 2019)........ *passim*

*Hauck v. Advanced Micro Devices, Inc.*, 816 F. App'x 39 (9th Cir. 2020)......................... *passim*

*Hodsdon v. Mars, Inc.*, 891 F.3d 857 (9th Cir. 2018)...................................................19, 20, 23, 27

*Hovsepian v. Apple, Inc.*, 2009 WL 2591445 (N.D. Cal. Aug. 21, 2009) ..............................28, 44

*Huynh v. Quora, Inc.*, --- F. Supp. 3d ---, 2020 WL 7495097 (N.D. Cal. Dec. 21, 2020) ......39, 40

*In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434 (N.D. Cal. 2018) ........... *passim*

*In re Ford Tailgate Litig.*, 2014 WL 1007066 (N.D. Cal. Mar. 12, 2014) ...................................42

*In re Intel Corp. Sec. Litig.*, 2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) ...............................46

*In re MacBook Keyboard Litig.*, 2020 WL 6047253 (N.D. Cal. Oct. 13, 2020) ....................36, 39

*In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014) ....................................................12

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 198 F. Supp. 3d 1183 (D.
Or. 2016)...............................................................................................................................24

*In re Samsung Galaxy Smartphone Mktg. & Sales Prac. Litig.*, 2020 WL 7664461 (N.D.
Cal. Dec. 24, 2020) ..............................................................................................................21

*In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352 (S.D.N.Y. 2016) .......................43

*Jones v. Tracfone Wireless, Inc.*, 2021 WL 411347 (N.D. Cal. Feb. 4, 2021) .............................42

*Julian v. TTE Tech., Inc.*, 2020 WL 6743912 (N.D. Cal. Nov. 17, 2020)...............................36, 38

*Karpowicz v. GMC*, 1997 WL 413929 (N.D. Ill. July 18, 1997)..................................................44

*Kearney v. Equilon Enters., LLC*, 65 F. Supp. 3d 1033 (D. Or. 2014)........................................45

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) ....................................................27, 45

*Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929 (C.D. Cal. 2012) ...................................45

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018)...........................................13

*Kondash v. Kia Motors Am., Inc.*, 2016 WL 11246421 (S.D. Ohio June 24, 2016) ...................43

*League of Wilderness Defs. v. Connaughton*, 2014 WL 12792263 (D. Or. Aug. 7, 2014) ...........40

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) .....................................13

*Matthews v. Am. Honda Motor Co.*, 2012 WL 2520675 (S.D. Fla. June 6, 2012).......................43

*Metalmark Nw., LLC v. Stewart*, 2004 WL 1970146 (D. Or. Sept. 2, 2004) ..............................19

*Moss v. U.S. Secret Serv.*, 572 F.3d 962 (9th Cir. 2009) ..................................................12

*N.K. Collins, LLC v. William Grant & Sons, Inc.*, 472 F. Supp. 3d 806 (D. Haw. 2020) ............41

*Nat'l Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292 (9th Cir. 1992)...........................................41

*Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964 (N.D. Cal. 2008)................................28, 34

*Pattie v. Coach, Inc.*, 29 F. Supp. 3d 1051 (N.D. Ohio 2014).........................................47

*Punian v. Gillette Co.*, 2016 WL 1029607 (N.D. Cal. Mar. 15, 2016).......................14, 23, 27, 28

*Reddy v. Litton Indus., Inc.*, 912 F.2d 291 (9th Cir. 1990) ..............................................18

*Rhynes v. Stryker Corp.*, 2011 WL 2149095 (N.D. Cal. May 31, 2011)................................36, 42

*Robinson v. C.R. Bard, Inc.*, 2016 WL 3361825 (N.D. Cal. June 17, 2016)................................42

*Rodriguez v. Just Brands USA, Inc.*, 2021 WL 1985031 (C.D. Cal. May 18, 2021)....................37

*Rogers v. Cisco Sys., Inc.*, 268 F. Supp. 2d 1305 (N.D. Fla. 2003)................................................48

*Russell v. Rolfs*, 893 F.2d 1033 (9th Cir. 1990)...............................................................18

*Sanders v. Apple Inc.*, 672 F. Supp. 2d 978 (N.D. Cal. 2009)..................................21, 34

*Sharma v. Volkswagen AG*, 2021 WL 912271 (N.D. Cal. Mar. 9, 2021)...............................36, 38

*Shay v. Apple Inc.*, 2021 WL 1733385 (S.D. Cal. May 3, 2021).....................................41

*Slebodnik v. Reynolds & Reynolds Co.*, 2014 WL 6609132 (D.N.J. Nov. 20, 2014)..............48, 49

*Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84 (D.N.J. 2011)................................44

*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) ........................................ *passim*

*Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075 (N.D. Cal. 2017), *aff'd*, 731 F.
App'x 719 (9th Cir. 2018) .........................................................................45

*Tabler v. Panera LLC*, 2020 WL 3544988 (N.D. Cal. June 30, 2020).........................................45

*Taragan v. Nissan N. Am., Inc.*, 2013 WL 3157918 (N.D. Cal. June 20, 2013) .........................21

*United States v. Corinthian Colleges*, 655 F.3d 984 (9th Cir. 2011)...............................................18

*Univ. Acct. Servs., LLC v. Schulton*, 2020 WL 2393856 (D. Or. May 11, 2020)........................41

*Ward v. Bolek*, 2013 WL 145828 (D. Or. Jan. 14, 2013) ..............................................................12

*Williams v. Apple, Inc.*, 2020 WL 6743911 (N.D. Cal. Nov. 17, 2020) .......................................37

*Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. 2012)...............................................20, 21

*Yastrab v. Apple Inc.*, 173 F. Supp. 3d 972 (N.D. Cal. 2016) .......................................................26

*Zaback v. Kellogg Sales Co.*, 2020 WL 6381987 (S.D. Cal. Oct. 29, 2020)................................35

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) .......................................13

## STATE CASES

*Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910 (Ill. 2007).....................................................47

*Bardin v. DaimlerChrysler Corp.*, 39 Cal. Rptr. 3d 634 (Ct. App. 2006) ...............................31, 32

*Chastain v. Koonce*, 700 S.W.2d 579 (Tex. 1985) ..................................................................49, 50

*D'Agostino v. Maldonado*, 78 A.3d 527 (N.J. 2013)...............................................................48, 49

*Engalla v. Permanente Med. Grp. Inc.*, 938 P.2d 903 (Cal. 1997)................................................27

*Gomez-Jimenez v. N.Y. Law Sch.*, 956 N.Y.S.2d 54 (App. Div. 2012) ........................................44

*Grgat v. Giant Eagle, Inc.*, 135 N.E.3d 846 (Ohio Ct. App. 2019)...............................................44

*Hill v. Roll Int'l Corp.*, 128 Cal. Rptr. 3d 109 (Ct. App. 2011).....................................................34

*Johnson v. Microsoft Corp.*, 834 N.E.2d 791 (Ohio 2005)............................................................49

*Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937 (Cal. 2003) .......................................34

*LiMandri v. Judkins*, 60 Cal. Rptr. 2d 539 (Ct. App. 1997) ...............................................23, 24, 26

*McBride v. Boughton*, 20 Cal. Rptr. 3d 115 (Ct. App. 2004) ........................................................33

*McKell v. Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227 (Ct. App. 2006)................................................13

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741 (N.Y. 1995) .......................................................................................................................44

*PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773 (Fla. 2003)...............................................44, 47

*Rockford Mem'l Hosp. v. Havrilesko*, 858 N.E.2d 56 (Ill. App. Ct. 2006) ...................................43

*Seely v. White Motor Co.*, 403 P.2d 145 (Cal. 1965) ......................................................................32

*Trejo v. Johnson & Johnson*, 220 Cal. Rptr. 3d 127 (Ct. App. 2017) ...........................................32

*Washburn v. Sterling McCall Ford*, 521 S.W.3d 871 (Tex. App. 2017) ........................................43

## STATUTES AND RULES

Federal Rule of Civil Procedure 9(b) ....................................................................................... *passim*

Federal Rule of Civil Procedure 12(b)(6) .........................................................................1, 12, 13

California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ................... *passim*

Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* .............42, 44, 47

Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505 ...42, 44, 47

New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1 *et seq.* ...........................42, 43, 44, 48

New York General Business Law, N.Y. Gen. Bus. Law §§ 349 *et seq.* .....................42, 43, 44, 45

Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.01 *et seq.* ................. *passim*

Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code Ann. §§ 17.41 *et seq.* ....42, 44, 49

## LR 7-1 CERTIFICATION

Pursuant to LR 7-1(a), undersigned counsel certifies that the parties discussed this motion in good faith via telephone conference on July 12, 2021, and were unable to reach a resolution.

## MOTION

Defendant Intel Corporation respectfully moves the Court to dismiss with prejudice both remaining California law "nationwide" counts (Count I, under the "unfair" prong of the Unfair Competition Law ("UCL," Cal. Bus. & Prof. Code §§ 17200 *et seq.*), and Count II, for quasi-contract or unjust enrichment) of the Second Amended Consolidated Class Action Allegation Complaint ("Complaint" or "2AC"), ECF No. 209, and bellwether Counts XI, XVI, XXXV, XXXVII, XL and XLIX (under the laws of Florida, Illinois, New Jersey, New York, Ohio, and Texas), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), for failure to state a claim.  Oral argument is requested.

## LEGAL MEMORANDUM

### INTRODUCTION

Plaintiffs' claims are rooted in two alleged design defects in Intel microprocessors dating back over a decade: Incomplete Undo and Unauthorized Access.  The trouble for Plaintiffs is that, as the Court found in reviewing their last complaint, Plaintiffs themselves have "broadly allege[d] public disclosure of the alleged defects."  ECF No. 204 ("Order") at 15.  Now, in amending, Plaintiffs cite the *exact same* public materials and characterize them *exactly the same way*.  Those entire swaths of the 487-page Complaint are re-alleged essentially verbatim—except that Plaintiffs now add, in two conclusory paragraphs, that those *exact same* public materials "do not disclose" Unauthorized Access after all.  *See* 2AC ¶¶ 11, 587.  This plainly inadequate stab at addressing a central deficiency in the prior complaint is a direct consequence of the box into which Plaintiffs have pleaded themselves: Plaintiffs' contention that *Intel* knew of the alleged "defects" in its

processors rests solely on the public information sources that necessarily confirm that neither Unauthorized Access nor Incomplete Undo was concealed *from the public*.  In other words, even if Plaintiffs could convince the Court that the cited sources did not alert the industry to the alleged defects, they would succeed only in establishing that Intel *itself* lacked the requisite knowledge of those alleged defects necessary to support any omission-based claim.

Although the Court also permitted Plaintiffs to attempt to plead facts showing that Intel's conduct was somehow "unfair without an underlying omission," *id.* at 23, Plaintiffs allege nothing else unfair or unjust that Intel has done.  Nor could they.  As the Ninth Circuit pointed out in the substantially identical *Hauck* case, Plaintiffs cannot "plausibly allege[] that the harm represented by the theoretical risk of a cybersecurity flaw that has not yet been successfully exploited outweighs the other benefits of [a manufacturer's] processor design." *Hauck v. Advanced Micro Devices, Inc.*, 816 F. App'x 39, 43 (9th Cir. 2020).[1]  This case is even more compelling for dismissal than *Hauck* because even after the Court invited Plaintiffs to plead what part of their expected bargain Intel did not meet, Plaintiffs continue to emphasize that "milliseconds matter" to consumers and do not plead that they would have traded any speed for additional security.  2AC ¶ 743; *see also id.* ¶ 739 ("Users *really* care about speed in interactive environments." (emphasis in original)).[2]  Simply put, Plaintiffs plead nothing "unfair" about the design of Intel CPUs as a matter of law.

Plaintiffs also have not cured the fundamental problem that led the Court to dismiss their claims for equitable relief.  Although the Court offered Plaintiffs an opportunity to "explain why

---

[1] Although *Hauck* is unpublished, it is persuasive authority from a Ninth Circuit panel.  *Hauck* is especially persuasive because it is not merely cited for a related point of law in an otherwise unrelated case, but rather deals with virtually identical substantive facts and issues as this case.

[2] Unless otherwise noted, all emphasis is added and internal punctuation and citations are omitted.

they do not have an adequate remedy at law," Plaintiffs' amendment only reinforces that this case is about money.  *See* Order at 23.  They claim to have been overcharged (or, for enterprise Plaintiffs, to have incurred monitoring, patching, or upgrading costs).  Damages are clearly adequate to remedy these supposed injuries.  As a result, under *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), both nationwide counts fail to state a claim for this independent reason.

Finally, like the nationwide claims, the state-law bellwether claims fail to allege an omission, or any "unfair" conduct on Intel's part.  Because Plaintiffs plead no unfair conduct, they plainly plead nothing "unconscionable" either.  That leaves only the claims of affirmative misrepresentations, but even on this third try, Plaintiffs cannot identify a *single* Named Plaintiff who relied on *any* security representation by Intel beyond the identical "general statements about speed or performance" that the Court already found "unrelated to security, … too vague and general to be actionable, or … mere puffery."  Order at 29.

Plaintiffs' inability to plead a plausible claim is a function of their implausible premises: First, that millions of consumers who bought computers fifteen years ago and used them without incident for the life of those devices were victims of fraud or otherwise treated unfairly.  And second, that millions of consumers buying computers today are *still* being defrauded, even as Plaintiffs allege forty times how the vulnerabilities involved in this case, and the potential performance impacts of patches for those vulnerabilities, are "well known in the market."  *E.g.*, 2AC ¶ 55.  The tensions in Plaintiffs' allegations as they strain to craft a cognizable theory of liability are irreconcilable and fatal.  Their remaining claims should be dismissed with prejudice.

## FACTS[3]

### A.     Performance and Security in Modern CPUs

Plaintiffs continue to allege that "[u]sers *really* care about speed in interactive environments" and that "*milliseconds* matter." 2AC ¶¶ 739 (emphasis in original), 743. Modern CPUs rely on various design strategies to provide the performance consumers want. Such strategies, incorporated in essentially all modern CPUs, include the use of "out-of-order execution" and "speculative execution." *Id.* ¶¶ 477-88. Out-of-order execution lets the CPU compute instructions in a different order than the program sent them, sparing the system from pausing to wait for data from a distant memory location. *Id.* ¶¶ 477-84. Speculative execution allows the CPU to execute instructions based on an educated guess as to the path a program will take, discarding unnecessary results if the guess was wrong. *Id.* ¶¶ 485-88.

Modern CPUs also rely on resource sharing, including through shared memory caches, to deliver improved performance. *See, e.g.*, *id.* ¶¶ 21, 506, 514, 518. This allows the CPU "to balance power, efficiency, and thermal output." *Id.* ¶ 518. Resource sharing, however, carries intrinsic risk. As Plaintiffs note, "any time a resource is shared, there is a possibility information can leak." *Id.* ¶ 575. Thus, Intel and other CPU manufacturers have long balanced the benefits of performance-enhancing features against the corresponding potential security risks. *See id.* ¶ 562. For example, Plaintiffs cite a known performance enhancement in Intel CPUs—the "prefetch" instruction—that allows the "CPU to fetch data before it is needed"; because this instruction bypasses privilege checks, Plaintiffs allege that it was long known to create the opportunity for unauthorized actors to gain access to sensitive information. *Id.* ¶ 594.

---

[3] Plaintiffs' allegations are assumed true for purposes of this motion only. All exhibits are attached to the Declaration of Steven Lovett; Exhibit 1 is a comparison prepared by Plaintiffs' counsel of the operative Complaint to the prior complaint, to assist the Court in reviewing the amendments.

The discovery of security vulnerabilities capitalizing on the design of computing products—including CPUs of every manufacturer—is accordingly a routine part of consumers' computing experience. Such vulnerabilities are so common that the industry has created "a standardized, industry-endorsed list of security vulnerabilities" called "Common Vulnerabilities and Exposures," or "CVE," which identifies each vulnerability with a unique number. *Id.* ¶ 24 n.11. "Due to the ever increasing volume of public vulnerability reports," the CVE numbering system was revamped in 2014 to "track more than 10,000 [new] vulnerabilities in a single year." Ex. 2 (Mitre.org, *CVE Frequently Asked Questions* (Mar. 3, 2021) (cited in 2AC ¶ 632 n.105)) at 7-8.

One class of vulnerability relevant to all modern CPUs are "side-channels," where "private information is deduced from observing the side-effects of [computer] operations." 2AC ¶ 565. Plaintiffs cite numerous publications dating back to 1991 that describe the potential for side-channel vulnerabilities in the CPUs of Intel and other manufacturers. *Id.* ¶¶ 571-96. These vulnerabilities are all "variation[s] of the same basic theme—an unauthorized actor exploiting the changes a process causes to the micro-architectural state of a CPU (in particular, a shared memory cache) in order to acquire another's information." Order at 13 (quoting ECF No. 181 ¶ 520, which is realleged verbatim at 2AC ¶ 575).

## B.     The "Intel CPU Exploits"

As in Plaintiffs' prior two complaints, the Complaint focuses on the novel class of side-channel vulnerabilities leveraging speculative and out-of-order execution that was discovered in 2017. 2AC ¶ 669. The first member of this class was "Spectre." *Id.* Other vulnerabilities named "Meltdown" and "Foreshadow" soon followed, *id.* ¶¶ 598, 610, and since then researchers have uncovered additional vulnerabilities in this class, including "Fallout, RIDL, ZombieLoad, SwapGS, LazyFP, Vector Register Sampling, and Cacheout." *Id.* ¶ 9.

These vulnerabilities all function in fundamentally the same way, by taking advantage of the intersection between "memory access protection and speculative execution of program instructions." *Id.* ¶ 5. Plaintiffs thus discuss these vulnerabilities collectively as the "Intel CPU Exploits." *Id.* ¶ 8. While their particular approach is novel, the Intel CPU Exploits pose the same risks as other side-channel vulnerabilities widely reported in earlier literature. Just as those prior vulnerabilities allowed "unauthorized actors to retrieve information from the CPU subsystems," *id.* ¶ 587, this latest class of vulnerabilities "allow[s] unauthorized third parties to exploit Intel's processor vulnerabilities to gain access to confidential information." *Id.* ¶ 5.

As in both prior consolidated complaints, Plaintiffs characterize as "Defects" certain design features in Intel CPUs that they contend Intel should have disclosed long before the discovery of the Intel CPU Exploits.[4] Those alleged Defects are the same design features the Court has previously examined: "Unauthorized Access" and "Incomplete Undo." Plaintiffs again define Unauthorized Access as the CPU "creat[ing] windows of time during which an unauthorized user could have the processor allow unnecessary or unauthorized memory access to copies of sensitive or privileged data," and Incomplete Undo as the CPU "allow[ing] the accessed privileged information (or data about that privileged information sufficient to allow an unauthorized user to retrieve the privileged information) to remain in the CPU's caches after the mistaken or unauthorized access is discovered." Order at 6; *see* 2AC ¶ 562. Plaintiffs emphasize that much

---

[4] As discussed below, *infra* pp. 23-27, Plaintiffs' effort to characterize design features as security-compromising "Defects" independent from any known security vulnerability is both logically and legally unsound. Nonetheless, for the sake of clarity, Intel uses Plaintiffs' self-serving terminology, referring to "Unauthorized Access" and "Incomplete Undo" as the "Defects" and to the later-discovered vulnerabilities that capitalize on those design features (e.g., Spectre and Meltdown) as the "Intel CPU Exploits."

like Intel's known prefetch design, 2AC ¶ 594, Unauthorized Access centers on Intel's alleged

failure to enforce "privilege checks," *see, e.g.*, Ex. 3 (12/1/20 Hr'g Tr.) at 75:9-16.

The Court previously found, based in large part on the allegations of and materials cited in

the prior complaint, that the design features at issue and their associated risks were publicly

disclosed.  Order at 14-15.  Plaintiffs do not contest industry knowledge of Incomplete Undo,

which the Court has twice concluded was discussed in "publicly available technical articles and

white papers" and thus was "not an omission."  *Id.* at 12; *see also* ECF No. 178 at 33.  They have,

however, added two conclusory paragraphs stating that "Plaintiffs are aware of no technical

articles or white papers that discuss the Unauthorized Access Defect" and that this alleged Defect

"was not written about or known to industry experts, academics, or the public at large."  2AC

¶¶ 11, 587.  But Plaintiffs contradict themselves by continuing to characterize the public side-

channel literature—the basis for the Court's conclusion that Unauthorized Access was publicly

known—in the exact same manner as before, and most importantly, continuing to allege that the

same literature was sufficient to put *Intel* on notice of Unauthorized Access.  *See id.* ¶¶ 588-97.

Plaintiffs acknowledge that the Intel CPU Exploits affect all manufacturers in some form.

*See, e.g.*, *id.* ¶¶ 677, 694 (alleging AMD is vulnerable to Spectre).  Indeed, Plaintiffs' own cited

sources also make clear that AMD processors are subject to security vulnerabilities that do not

affect Intel, such as "the Ryzenfall bugs [that] would have allowed attackers to take full control of

the AMD Secure Processor."[5]  At the same time, Plaintiffs characterize the Intel CPU Exploits as

---

[5] Ex. 4 (Lucian Armasu, *Intel vs AMD Processor Security: Who Makes the Safest CPUs?*, Tom's Hardware (Nov. 4, 2019) at 5-6 (cited in 2AC ¶ 697 n.128)).  These AMD vulnerabilities "have a very high severity rating."  *Id.*  In March 2020, AMD disclosed another speculative execution-based side channel variant, "Take A Way," to which Intel CPUs are not susceptible. AMD Product Security, *Take A Way* (Mar. 7, 2020), https://www.amd.com/en/corporate/product-security ("Bulletins Archive": new variant permits unauthorized user to "transmit user data in an unintended way").

"largely an Intel-only problem," *id.* ¶ 9, and even demand that the Court enjoin Intel "to cease ... representing that the Intel CPU Exploits are industry-wide problems," *id.* ¶ 919.

Plaintiffs also continue to allege that the Intel CPU Exploits have been "weaponized." *Id.* ¶¶ 687-92. But Plaintiffs still cannot represent that any Named Plaintiff (or any person in the world) has actually had data stolen via any Intel CPU Exploit. Notably, just as in their prior complaint, Plaintiffs' citations in support of the claim that these vulnerabilities have been "weaponized" still date from January or February 2018, more than three years ago. *See id.*

### C.    Intel's Compliance with Responsible Disclosure Practices

As before, the proposed class period encompasses the six-month period in 2017 when Intel and certain other companies were intensively working on mitigations for Spectre and Meltdown. 2AC ¶ 886; ECF No. 181 ¶ 780. And as before, Plaintiffs allege that Intel "unreasonably delayed disclosing the [Intel CPU Exploits] for months" after learning about them in the middle of 2017. 2AC ¶ 26; ECF No. 181 ¶ 23. But the materials Plaintiffs cite confirm that disclosing vulnerabilities only when mitigations are ready for deployment is widely accepted as an industry best practice by vendors and security researchers alike. For example, the researchers that discovered Meltdown used "the practice of responsible disclosure": they disclosed the vulnerability to "groups of CPU vendors and other affected companies" and then, "[i]n coordination with the industry," they "participated in an embargo of the results." Ex. 5 (Moritz Lipp et al., *Meltdown: Reading Kernel Memory from User Space* (2018), https://meltdownattack.com/meltdown.pdf at 1 n.10 (cited in 2AC ¶¶ 602-03)). It is "[s]tandard practice" to set "an embargo date," before which "*nobody does anything publicly*" such as "publish[ing] advisories." Ex. 6 (Colin Percival, *Some Thoughts on Spectre & Meltdown*,

Daemonic Dispatches Blog (Jan. 17, 2018 2:40 PM) at 5 (cited in 2AC ¶ 574)) (emphasis in original).[6]

### D.    The Mitigations

Intel released mitigations for Spectre and Meltdown in 2017 and 2018 and has released additional mitigations for the later-discovered speculative-execution vulnerabilities.    2AC ¶¶ 715-34.  Plaintiffs concede that these mitigations "ostensibly eliminate the threat of the publicly disclosed Intel CPU Exploits."  *Id.* ¶ 18.  But Plaintiffs allege that the mitigations diminish the performance of their processors, in the range of approximately 5-30% for the default mitigations. *See id.* ¶ 19.  As the Court noted, "[d]ecreasing a processor's speed by 30 percent is still an infinitesimal change."  Order at 18 (citing *Hauck v. Advanced Micro Devices, Inc.*, 2018 WL 5729234, at *9 (N.D. Cal. Oct. 29, 2018)).

### E.    Intel's Marketing Statements

As before, the Complaint discusses Intel advertisements stating, for example, that Intel CPUs are "secure" or "secure to the core."  2AC ¶¶ 534-37; *compare* ECF No. 181 ¶¶ 499-502. These items are re-alleged verbatim, except that Plaintiffs add a reference to one advertisement, using the phrase "strong security," that was published during the embargo period for Spectre and Meltdown in 2017.  2AC ¶ 545.  None of these advertisements represented that an Intel CPU would be impervious to all security vulnerabilities.  Plaintiffs also discuss certain of Intel's performance advertisements, many of which were cited before as well, *see, e.g.*, *id.* ¶¶ 745-46; ECF No. 181

---

[6] The U.S. government follows the same responsible disclosure practice as Intel and every other major technology company. *See, e.g.*, https://www.cisa.gov/coordinated-vulnerability-disclosure-process (describing the Cybersecurity and Infrastructure Security Agency's coordinated vulnerability disclosure process).  "[T]he court can take judicial notice of ... websites run by governmental agencies."  *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015).

¶¶ 689-90, and others of which are new allegations dating to the embargo period in 2017, 2AC ¶¶ 539-55. None of those performance advertisements explicitly or implicitly guaranteed any particular level of security or promised that the precise performance levels at the time of sale would be sustained through all future patches. *See* Order at 29-30 ("The Court rejects Plaintiffs' argument that representations about speed or performance 'implicitly' contain a representation related to security.").

### F.    The Named Plaintiffs

The Complaint consolidates the claims of 48 Named Plaintiffs. Each alleges having bought one or more devices containing Intel processors from third parties, such as Amazon or Best Buy. *E.g.*, 2AC ¶¶ 51, 124. Just as in the prior complaint, each alleges having "reviewed and relied on the information about the [computer] and Intel processor that was displayed [in the store or online]." *E.g.*, *id.*; ECF No. 181 ¶¶ 41, 108. None alleges any specific claim or representation relied upon, whether at the store, online, or otherwise. Nor does any Named Plaintiff claim to have suffered a hack or data breach. Yet each alleges that had Intel disclosed the alleged "Defects in the Intel CPUs, or that mitigations needed to address the Defects would materially impact the CPUs' functionality and performance," they "would have seen [such disclosures] and no doubt have taken them into account in making [their] purchasing decision." *E.g.*, 2AC ¶¶ 56, 129.

Almost every Named Plaintiff alleges in near verbatim fashion that "[a]fter disclosure of the Intel CPU Exploits" in January 2018, "it became *well known in the market* that processor performance of Intel's CPUs would be negatively impacted … as a result of the patches necessary to mitigate the threat of unauthorized access to private information from the Intel CPU Exploits stemming from the undisclosed Defects." *E.g.*, *id.* ¶¶ 55, 67, 128. Although Plaintiffs have dropped the five prior Named Plaintiffs who purchased after the public disclosure of the exploits (including two who purchased *after they sued*), *see* ECF No. 115 ¶¶ 15, 22, 24, 82, 111, Plaintiffs

allege that Intel "continues to deceive" them, and they seek to certify a nationwide class of all purchasers from 2006 to the present, including those five former Named Plaintiffs. 2AC ¶¶ 15, 887. Thus, without any explanation, Plaintiffs simultaneously allege both that every purchaser of an Intel CPU from 2006 to the present "would have paid less" had Intel disclosed the alleged Defects or the performance impact of the mitigations, *id.* ¶ 35; *see also, e.g.*, *id.* ¶¶ 56, 68, 129, and also that millions of purchasers from January 2018 to the present are *not* paying any less even though these issues are "well known in the market." *Id.* ¶¶ 55, 67, 128, 887. Plaintiffs further allege that consumers are forced to continue purchasing Intel CPUs in light of Intel's market share, *id.* ¶ 884, an allegation that cannot be squared with Plaintiffs' constant refrain that they would have purchased a CPU from another manufacturer (e.g., AMD) had they known about the Defects, *e.g.*, *id.* ¶¶ 56, 68, 129.

### G. Plaintiffs' Allegations Remain Indistinguishable from *Hauck*.

The core allegations in the Complaint are materially indistinguishable from the allegations against AMD in *Hauck*. *See* ECF No. 190 at 10-12 (detailing such similarities). As here, the *Hauck* plaintiffs alleged (1) that the defective design of AMD's CPUs leaves those processors susceptible to attacks that "compromise[] the security of users' most sensitive data"—like "encryption keys or passwords"—without detection, Ex. 7 (*Hauck* Complaint), ¶¶ 2-3, 62, 66, 109; *compare* 2AC ¶¶ 5-6, 606; (2) that AMD implemented the design features underlying these attacks in a conscious effort to sacrifice security for speed as it battled Intel for the "speed crown," Ex. 7, ¶¶ 3, 62, 64; *compare* 2AC ¶ 490; (3) that AMD disregarded the security risk posed by its CPU design despite being aware of many of *the same research publications cited here*, Ex. 7, ¶¶ 5, 125-56; *compare* 2AC ¶¶ 571-96; (4) that AMD concealed the "defects" in its CPUs, "falsely marketed [its CPUs] as defect-free," and "touted the security of its processors," all so that AMD "could profit from the sale of [its CPUs]," Ex. 7, ¶¶ 62, 66-67, 94, 99, 175, 186, 275; *compare*

2AC ¶¶ 3, 10, 16, 527; (5) that despite these promises, AMD elected not to secure its CPUs with known safeguards, Ex. 7, ¶¶ 139, 156; *compare* 2AC ¶¶ 679-84; (6) that AMD learned of novel exploits taking advantage of the defects in June 2017 but did not publicly disclose them until January 2018, Ex. 7, ¶¶ 157, 163; *compare* 2AC ¶ 26; (7) that the patches released after the defects were exposed did not fix those defects, and instead reduced performance by as much as 50% or rendered CPUs "inoperable," Ex. 7, ¶¶ 165-74; *compare* 2AC ¶¶ 705-11; and (8) that AMD defrauded even consumers who purchased after the public disclosure of Spectre, *see* Ex. 7, ¶¶ 29-33; *compare* 2AC ¶¶ 15, 887.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While the Court must accept well-pleaded allegations as true and draw reasonable inferences in favor of the plaintiff, it should not credit legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Nor should it "accept allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Ward v. Bolek*, 2013 WL 145828, at *1 (D. Or. Jan. 14, 2013); *see also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 971-72 (9th Cir. 2009).

In addition to the allegations of the complaint and facts subject to judicial notice, in deciding a motion to dismiss, the Court may consider, "in [their] entirety," documents incorporated into the complaint by reference (such as the articles Plaintiffs quote and cite). *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052, 1058 n.10 (9th Cir. 2014). This rule "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those

very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

As the deficiencies in Plaintiffs' theory cannot be cured after two opportunities to amend, dismissal with prejudice is warranted. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009).

## ARGUMENT

## I.    PLAINTIFFS FAIL TO STATE A NATIONWIDE UCL CLAIM (COUNT I).[7]

The Court previously dismissed with prejudice Plaintiffs' claims under the "unlawful" and "fraudulent" prongs of the UCL, Order at 20-21, and dismissed without prejudice their claim under the "unfair" prong, *id.* at 21-24. Plaintiffs now reassert an "unfair" UCL claim based on the same allegations of fraud the Court found insufficient to support claims under the other prongs. 2AC ¶ 907. But repackaging the dismissed fraud claim as "unfairness" does not state a claim.

The UCL balancing test the Court previously applied asks whether the alleged practice "violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." Order at 21 (quoting *McKell v. Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227, 240 (Ct. App. 2006)). While unfairness may be a fact question *if supported by appropriate allegations*, federal courts do not hesitate to dismiss such claims under Rule 12(b)(6) when "the complaint fails to allege facts showing that a business practice is unfair." *Davis v. HSBC Bank Nev. N.A.*, 691 F.3d 1152, 1171 (9th Cir. 2012); *see also, e.g.*, *Hauck*, 816 F. App'x at 43 (affirming dismissal of UCL claim premised on AMD's omission of design features underlying Spectre); *In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434, 464 (N.D.

---

[7] Plaintiffs argue that California law governs all claims in this action. 2AC ¶¶ 434-41. Intel reserves the right to argue that California law cannot govern claims by non-California persons. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012).

Cal. 2018) (dismissing UCL unfair claim alleging software updates hurt performance); *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 858 (N.D. Cal. 2012) (dismissing UCL unfair claim alleging defective laptop design).

Here, the Court held that Plaintiffs failed to state a UCL "unfair" claim based on an alleged omission because Plaintiffs *admitted* that Unauthorized Access and Incomplete Undo "were known in the industry." Order at 22-23. The Court allowed Plaintiffs to try to plead how there actually was an omission despite their prior admissions, or how Intel's conduct was unfair "without an underlying omission." *Id.* at 23. Plaintiffs have not succeeded on either front: They still fail to allege any material omission, or any other basis for finding Intel's conduct actionably unfair. Plaintiffs' unfairness claim is instead precisely the same deficient fraud claim that the Court already rejected. Because their unfairness claim "overlap[s] entirely" with the fraud claim, the unfairness claim necessarily fails, too. *Hauck v. Advanced Micro Devices, Inc.*, 2019 WL 1493356, at *15 (N.D. Cal. Apr. 4, 2019); *see also In re Apple Device*, 347 F. Supp. 3d at 464 (dismissing UCL unfair claim in light of failure to allege duty to disclose design defect); *Punian v. Gillette Co.*, 2016 WL 1029607, at *17 (N.D. Cal. Mar. 15, 2016) (dismissing with prejudice UCL unfair claim that "overlaps entirely" with fraudulent omission claims).

### A.    Plaintiffs Have Not Identified Any Material Omission.

As before, the Complaint centers on Intel's alleged failure to disclose Incomplete Undo and Unauthorized Access. That claim fails at the threshold because, just as in their prior complaint, Plaintiffs allege *both* "Defects" were publicly known in an effort to show Intel's knowledge of them. Order at 13-15. Their claim also fails because retroactively labelling Intel's design features as "Defects" with the benefit of hindsight disregards the Ninth Circuit's reasoning in *Hauck*. Finally, Plaintiffs' UCL claim fails because they still have not pled materiality.

1.     **Either Both Defects Were Publicly Known or Intel Had No Knowledge of Them—Plaintiffs' Claim Fails Either Way.**

The Court dismissed the UCL "unfair" claim in Plaintiffs' prior complaint because, "[b]ased on the allegations in the Amended Complaint that broadly allege[d] public disclosure of the alleged defects and [Plaintiffs'] counsel's admission that the publicly-disclosed information relates to both alleged defects, the Court [found] that Plaintiffs [had] not sufficiently alleged that Intel suppressed or concealed the alleged defects." Order at 15.  Plaintiffs have failed to rescind those prior allegations and admissions.  Instead, they repeat *verbatim* the substantive allegations that led to the Court's conclusion, and do nothing more than ask the Court to reach the opposite conclusion than before on the same exact facts.  *See* 2AC ¶¶ 11, 587.  But even if their conclusory and contradictory attempted retraction were credited, Plaintiffs would then necessarily have alleged that *Intel itself* lacked knowledge of the Defects.  Either way, Plaintiffs have failed to state a UCL unfairness claim premised on the omission of the Defects.

a.     **Plaintiffs Have Failed to Retract Their Prior and Dispositive Admissions that Both Defects Were Public Knowledge.**

Every paragraph of Plaintiffs' prior complaint that this Court cited in finding that the Defects were publicly known remains, *verbatim*, in the current Complaint.  *See* Order at 13-14 (citing ECF No. 181 ¶¶ 516-29); *compare* 2AC ¶¶ 571-84.  That is because Plaintiffs continue to allege, just as the Court previously found, "that Intel's knowledge of both Incomplete Undo and Unauthorized Access is evidenced by [] technical articles, white papers, and patent filings." Order at 14.  Plaintiffs again allege that "discussions of the fundamental problems that underlie the vulnerabilities appear in computer science literature from the early- to mid-1990s." 2AC ¶ 571 (discussing publications from 1991 and 1995); *see also id.* ¶¶ 572-97 (discussing disclosure of Defects in additional publications).  And, again, the Complaint includes an entire section entitled "Intel Knew That Permitting Unprotected Memory Access During Speculative Execution Could

Be Exploited," where Plaintiffs support that assertion entirely through public literature that Plaintiffs claim gave Intel knowledge of Unauthorized Access and Incomplete Undo.  2AC ¶¶ 588-97 (discussing papers disclosing Intel's "decision to permit unchecked memory accesses in its processors"); *compare* ECF No. 181 ¶¶ 532-41.  As before, if that literature gave *Intel* knowledge of the alleged Defects, it gave *the public* such knowledge as well.  Order at 13-15.[8]

For example, Plaintiffs allege that the industry has known for nearly a decade that an Intel design feature—"prefetch"—"could be used to access illegal or unprivileged memory space without generating any exceptions."  2AC ¶ 594 (referring to Intel reference manuals from 2012). Plaintiffs also cite a publication explaining that, because prefetch "*ignore[s]* privilege levels and access permissions," an "unauthorized user" could use it to "access 'inaccessible kernel memory.'" *Id.* (citing Daniel Gruss et al., *Prefetch Side-Channel Attacks: Bypassing SMAP & Kernel ASLR* (2016), https://mlq.me/download/prefetch.pdf).  Plaintiffs similarly describe another known Intel design feature ("TSX") that supposedly "suppresses exceptions" in a manner that allows an unauthorized user to "gain access to kernel information."  *Id.* ¶ 596 (citing Yeongjin Jang et al., *Breaking Kernel Address Space Layout Randomization with Intel TSX* (2016), https://taesoo.kim/pubs/2016/jang:drk-bh.pdf).    Likewise, Plaintiffs allege how researchers disclosed "as early as 2006 [that Intel's] deferral of exceptions can be exploited to facilitate information leakage."  *Id.* ¶ 592; *see also* Ex. 8 (Zhenghong Wang et al., *Covert & Side Channels due to Processor Architecture* (2006) at 4 (cited in 2AC ¶ 592)) (discussing deferral of exceptions in Intel Itanium processors).  And Plaintiffs continue to cite, *verbatim*, the same patent filings as

---

[8] As before, Plaintiffs allege that these public materials were too technical for consumers to understand.  2AC ¶ 583; *compare* ECF No. 181 ¶ 528.  The Court already has held that because "[t]echnically sophisticated persons, such as technical product reviewers, can explain complicated information (or at least the effects) to the general consuming public," widespread industry knowledge of these vulnerabilities drives consumers' knowledge of them, too.  Order at 14-15.

the prior complaint, again asserting that these filings (from 2007 and 2011) disclosed that Intel's "hardware design could be used to leak privileged information." *Id.* ¶ 584.

Plaintiffs allege that these publicly known designs ignore privilege checks to grant unauthorized access to inaccessible memory. As such, they fall squarely within Plaintiffs' definition of Unauthorized Access—designs that allow "an unauthorized user [to] have the processor make unnecessary or unauthorized accesses to copies of sensitive or privileged information." *Id.* ¶ 562; *see also id.* ¶ 6 (Unauthorized Access "allows program instructions unauthorized access to protected data"). In fact, as Plaintiffs' counsel repeatedly argued at the hearing on Intel's prior motion to dismiss, the "fundamental hardware security" issue at the heart of Unauthorized Access is "the privilege check"—the *same* issue presented by the publicly known design features discussed above. Ex. 3 at 99:11-12; *see also id.* at 75:9-16 (discussing "design decision ... to delay privilege checks, which allows unauthorized access"); *id.* at 10:8-11 ("they eliminated or they delayed privilege checks that allowed for unauthorized access"); *id.* at 11:21-23 (unauthorized access rooted in "delaying privilege checks"); *id.* at 13:1-5 ("by allowing unauthorized access, by delaying those privilege checks … Intel almost invited those attacks"); *compare* 2AC ¶¶ 592-96 (alleging that publicly-known design features "*ignore* privilege levels" and "*suppress[] exceptions*" (emphasis in original)). Because Plaintiffs have alleged the widespread publication of the very design decision alleged to be the core of Unauthorized Access, it follows (just like last time) that the industry had knowledge of it. Order at 13-15.

Plaintiffs purport to address the deficiency in their prior complaint—i.e., their admissions that both Defects were publicly known—entirely through two conclusory paragraphs contradicting their own factual allegations. They cite the exact same literature as before, and characterize that literature exactly the same way, but now contend that those documents "do not disclose or even

discuss the Unauthorized Access Defect."  2AC ¶¶ 11, 587.  As the Court repeatedly has cautioned, that is not a proper amendment.  A plaintiff may fix defects in her pleading "if the deficiencies can be cured with additional allegations that are 'consistent with the challenged pleading' and that do not contradict the allegations in the original complaint."  *See, e.g.*, *Bullseye Glass Co. v. Brown*, 2019 WL 8323619, at *1 (D. Or. Jan. 22, 2019) (quoting *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011)); *see also Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) (a plaintiff may not "amend its pleadings to directly contradict an earlier assertion made in the same proceeding" (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)); *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296-97 (9th Cir. 1990) ("Although leave to amend should be liberally granted, the amended complaint may only allege other facts consistent with the [prior] challenged pleading.").  Intel does not believe that the Court intended to permit Plaintiffs to make the *identical, verbatim factual allegations* and amend solely through a conclusory and inconsistent denial unsupported by new facts.

Even if Plaintiffs' conclusory retraction were permissible, their effort at revisionist history would fail.  Plaintiffs now assert that the public literature "simply address[es] the ability of unauthorized actors to retrieve information from the CPU subsystems and that Intel knew how to prevent it."  2AC ¶ 587.  But Plaintiffs do not (and cannot) explain how the "ability of unauthorized actors to retrieve information from the CPU subsystems," *id.*, differs at all from Unauthorized Access as they define it: the ability of "unauthorized user[s] to make unnecessary or unauthorized access to copies of sensitive or privileged information," *id.* ¶ 562.  Nor can their conclusory allegations overcome their more specific allegations about what the individual papers actually disclose—which Plaintiffs repeat *verbatim* from their prior complaint—and which reinforce that Unauthorized Access was publicly known.  *See, e.g.*, *Garrison v. Oracle Corp.*, 159 F. Supp. 3d

1044, 1076 (N.D. Cal. 2016) (declining to credit general allegations on motion to dismiss where "Plaintiffs' specific factual allegations contradict[ed] Plaintiffs' general allegations"); *Metalmark Nw., LLC v. Stewart*, 2004 WL 1970146, at *3 (D. Or. Sept. 2, 2004) (declining to credit "general statement" contradicted by "more specific allegations").

At bottom, "[b]ecause Plaintiffs [continue to] assert that the alleged articles and white papers show *Intel's* knowledge of both alleged defects, it also follows that they are evidence showing '*industry* knowledge' of both alleged defects." Order at 13. And, in turn, "[i]nformation that was known in the industry is not information that … Intel fraudulently concealed or suppressed." *Id.* at 14. Thus, just as in the prior complaint, "Plaintiffs have not alleged an actionable omission or concealment." *Id.* at 15.

The Ninth Circuit's decision in *Hodsdon v. Mars, Inc.* renders that failure dispositive of Plaintiffs' "unfair" UCL claim. 891 F.3d 857 (9th Cir. 2018). There, the Ninth Circuit affirmed the dismissal of a UCL unfair claim alleging that Mars had failed to "disclose on its [candy] labels the [slave] labor practices that may taint its supply chain." *Id.* at 860-61. The court reasoned both that the labor practices did not amount to a central functional defect that would give rise to a duty to disclose *and* that those labor practices had been publicly disclosed on Mars's website. *Id.* at 860-61, 864-65, 867. Because the failure to disclose information "when there is no specific duty to disclose this information and the information is otherwise [publicly] disclosed" was not unfair, the court affirmed dismissal as a matter of law. *Id.* at 867. The *Hodsdon* analysis is on all fours here. This Court has twice held that Intel did not have a duty to disclose Unauthorized Access or Incomplete Undo because neither constitutes a central functional defect in Intel CPUs. Order at 15-20. And, as discussed above, Plaintiffs have also alleged that those purported Defects were

"public knowledge," just like the alleged slave labor supply-chain issues in *Hodsdon*. 891 F.3d at 867. *Hodsdon* therefore requires the dismissal of Plaintiffs' "unfair" UCL claim.

> **b.    Alternatively, Plaintiffs' Retraction of Allegations as to *Industry* Knowledge of the Defects Would Preclude Any Claim as to *Intel's* Knowledge.**

Plaintiffs' conclusory and inconsistent allegations about whether Unauthorized Access was publicly known create another problem for their omission-based unfairness claim. Even if Plaintiffs *could* take back their prior admissions that Unauthorized Access was publicly known, that would deprive them of any factual basis for their claim that Intel had knowledge of the alleged Defect. Plaintiffs rely exclusively on citations to public literature to show Intel's supposed knowledge. 2AC ¶¶ 571-97. If none of that literature "disclose[s] or even discusses the Unauthorized Access Defect," *id.* ¶ 587, as they now assert, it necessarily follows that the literature did not put Intel on notice that its design was defective.[9] And because a party cannot be liable for failing to disclose a fact of which it was not aware, Plaintiffs' claim would still fail as a matter of law. *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145-48 & n.5 (9th Cir. 2012) (dismissing UCL omission claim for failure to allege sufficient factual basis supporting defendants' knowledge of defect at time of sale).

Nor can Plaintiffs cure this failing by arguing that Intel's knowledge of its own processor design equates to knowledge of Unauthorized Access. Courts routinely reject arguments that a manufacturer's knowledge "with regard to its own technology" gives it knowledge about all

---

[9] The Court already noted this exact point—that the allegations of *Intel's* knowledge are based entirely on public literature—in reviewing the identical allegations of the prior complaint: "The Amended Complaint alleges that Intel's knowledge of both Incomplete Undo and Unauthorized Access is evidenced by the technical articles, white papers, and patent filings. … Because Plaintiffs assert that the alleged articles and white papers show Intel's knowledge of both alleged defects, it also follows that they are evidence showing 'industry knowledge' of both alleged defects." Order at 14.

possible defects in that technology. *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 986 (N.D. Cal. 2009) (rejecting contention that Apple's knowledge of its own design established Apple knew its computers were "designed with an inferior display"); *see also, e.g.*, *Wilson*, 668 F.3d at 1145-48 (allegations that "defendants were in a superior position to know the truth" about their own products or had "exclusive knowledge as the manufacturer" insufficient to show knowledge (internal quotation marks omitted)); *Taragan v. Nissan N. Am., Inc.*, 2013 WL 3157918, at *6-7 (N.D. Cal. June 20, 2013) (insufficient to allege "merely that the defendant has a superior understanding about the product's design generally"). Rather, Plaintiffs must allege "specific facts that they claim should have alerted [Intel] that [its CPUs were], in fact, defective." *Taragan*, 2013 WL 3157918, at *7; *see also Hauck*, 2019 WL 1493356, at *12 ("[A] plaintiff may not state an omission claim with allegations that a defendant *should have* known about a defect from general knowledge." (emphasis in original)).

With no other basis beyond the legally irrelevant assertion that Intel knows its own designs, Plaintiffs' allegations "fall far short" of supporting a conclusion that Intel had knowledge of Unauthorized Access. *Taragan*, 2013 WL 3157918, at *7. That failure, in turn, independently dooms their UCL claim. *E.g.*, *Wilson*, 668 F.3d at 1145-48 & n.5 ("[T]he failure to disclose ... a defect of which [a manufacturer] is not aware[] does not constitute an unfair or fraudulent practice."); *In re Samsung Galaxy Smartphone Mktg. & Sales Prac. Litig.*, 2020 WL 7664461, at *11 (N.D. Cal. Dec. 24, 2020) ("Plaintiffs' failure to adequately plead Defendants' knowledge of the defect is fatal to their claim of 'unfairness' as well.").

### c.    Intel's Alleged Conduct After Learning of *the Intel CPU Exploits* Is Irrelevant to a UCL Claim Based on Omission of *the Defects*.

Plaintiffs attack Intel's responsible disclosure practices, alleging that Intel "unreasonably delayed disclosing the [Intel CPU Exploits] for months" after finding out about the new

vulnerabilities in June of 2017, and has "manipulated the process" of disclosure. 2AC ¶¶ 26, 915. Plaintiffs raised similar allegations in the prior complaint, *see, e.g.*, ECF No. 181 ¶¶ 23, 656, and the Court did not find them relevant in analyzing Plaintiffs' UCL or fraud claims. *See generally* Order at 10-23. These allegations are no more relevant now.

Plaintiffs' claims center on the design decisions they characterize as the "Defects," not on the Intel CPU Exploits. *See, e.g.*, 2AC ¶¶ 56, 62. Plaintiffs continue to assert that *all* purchasers of Intel CPUs from 2006 to the present—that is, purchasers from long before until long after the discovery, mitigation, and widespread media coverage of Spectre and Meltdown—have been equally deceived by Intel as to the alleged Defects. *Id.* ¶¶ 887, 892. Indeed, Plaintiffs allege that millions of purchasers continue buying Intel CPUs—and *overpaying* for them—despite the fact that the mitigations and Intel CPU Exploits have all been disclosed to the public. *Id.* ¶¶ 15, 61, 887, 895, 910. Almost every Named Plaintiff alleges that it is now "*well known in the market* that processor performance of Intel's CPUs would be negatively impacted—across the board—as a result of the patches necessary to mitigate the threat of unauthorized access to private information from the Intel CPU Exploits stemming from the undisclosed Defects." *See, e.g., id.* ¶¶ 61, 67, 215.

Just as in the prior complaint, these allegations confirm that Intel's adherence to standard industry practices of responsible disclosure, and thus any supposed "omission" with respect to the Intel CPU Exploits or their mitigations starting in 2017, is immaterial to consumers and irrelevant to this case. *See, e.g., In re Apple Device*, 347 F. Supp. 3d at 461-62 (where claimed omission was untethered to the "alleged harm," finding allegations insufficient to support UCL claim).

\*     \*     \*

Plaintiffs have failed to cure the deficiencies the Court identified in dismissing their prior attempt to plead a UCL "unfair" claim. They have either alleged that both Defects were publicly

known, or they have failed to allege that Intel had knowledge of them.  The Court need proceed

no further, as Plaintiffs' UCL claim should be dismissed with prejudice on these grounds alone.

>    2.    ***Hauck* Confirms That Plaintiffs' Fraud-by-Hindsight Theory Fails To Satisfy Any of the *LiMandri* Factors or the Materiality Requirement.**

Even if Plaintiffs could plausibly allege that Intel knew of and omitted disclosure of

Unauthorized Access, the Ninth Circuit's reasoning in *Hauck* offers multiple independent bases to

dismiss Plaintiffs' UCL "unfair" omission claim, 2AC ¶¶ 908-15.  *Hauck* explains that a

manufacturer's general knowledge of "some of the vulnerabilities created by its design choices"

does not give it actionable knowledge of a defect that would support a claim of "unfair" conduct

stemming from the failure to disclose material information.  816 F. App'x at 42-43.  Plaintiffs

instead must identify a specific vulnerability, e.g., "Spectre-like attacks in particular," and may

not rely on allegations that processor caches "are vulnerable to side-channel attacks generally" or

are vulnerable generally "because of … some other subset of their features."  *See id.*  On this

reasoning, Plaintiffs' UCL claim fails on multiple grounds.  It does not satisfy any of the *LiMandri*

*v. Judkins*, 60 Cal. Rptr. 2d 539, 543 (Ct. App. 1997) factors or allege materiality, each of which

California law requires to support a fraudulent omission claim.  *Hodsdon*, 891 F.3d at 863

(requiring satisfaction of at least one *LiMandri* factor to support fraudulent omission claim);

*Punian*, 2016 WL 1029607, at *17 (dismissing fraud-based UCL unfair claim for failure to allege

materiality); *see also Hauck*, 816 F. App'x at 43 (after dismissing fraud claims, addressing UCL

claim only to the extent not "also grounded in fraud").[10]

---

[10] Plaintiffs likewise fail to allege a central functional defect, which, as the Court has held, is also required to establish the duty to disclose that is a necessary predicate to a fraudulent omission claim.  Order at 12.

a. **Plaintiffs Have Failed to Allege Any of the *LiMandri* Factors Necessary To Support Their UCL Theory.**

To establish an actionable omission to support their UCL claim, Plaintiffs must show that: (1) Intel was Plaintiffs' fiduciary; (2) Intel had "exclusive knowledge" of the facts at issue; (3) Intel "actively conceal[ed]" the facts at issue; or (4) Intel made literally true but misleading statements (i.e., half-truths). *LiMandri*, 60 Cal. Rptr. 2d at 543. Plaintiffs have expressly disclaimed reliance on the first and fourth *LiMandri* factors, ECF No. 192 at 20 & n.12, and instead attempt to satisfy the "exclusive knowledge" and "active concealment" factors by asserting that Intel had knowledge of Unauthorized Access and Incomplete Undo. *See* 2AC ¶¶ 5, 908-15. But, consistent with *Hauck*, whatever knowledge Intel had of the Unauthorized Access and Incomplete Undo design features fails to show that Intel had knowledge of a *specific vulnerability* allegedly enabled by those design features. Plaintiffs have thus failed to demonstrate that Intel had knowledge, exclusive or not, of any defect Intel could have disclosed to the public before Intel learned of the first Intel CPU Exploit in June 2017. *Id.* ¶ 669. That deficiency requires the dismissal of all Named Plaintiffs who purchased their Intel CPUs before June 2017, such as California Named Plaintiffs Ferrer and Green. *Id.* ¶¶ 51, 57.[11]

In *Hauck*, the Ninth Circuit completely rejected the plaintiffs' strategy of redefining, with the benefit of hindsight, the "subset of ... features" underlying AMD's vulnerability to the Spectre exploit as a "defect," yet Plaintiffs here have adopted the exact same strategy. In purporting to represent a putative class of CPU purchasers back to 2006, well before the discovery of any of the Intel CPU Exploits, 2AC ¶ 672, Plaintiffs assert Intel knew of and failed to disclose the design

---

[11] For the same reasons, Plaintiffs have failed to allege that Intel "concealed" anything under the third *LiMandri* factor. Nor do Plaintiffs ever allege how any such concealment was "active." *See In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 198 F. Supp. 3d 1183, 1193-94 (D. Or. 2016) (requiring specific facts regarding what was done to actively conceal).

features that later made those exploits theoretically possible—the alleged Defects.  *See id.* ¶¶ 4-6, 598, 669.  But calling these features "Defects" is just another way of restating Intel's susceptibility to side-channel attacks generally or to as-yet-unknown attacks like Spectre or Meltdown.  Plaintiffs attempt to obfuscate this problem by pejoratively renaming elements of Intel's design, but "Unauthorized Access" and "Incomplete Undo" are not security vulnerabilities.  They are, as Plaintiffs elsewhere admit, performance-enhancing design features.  *Id.* ¶¶ 562, 589.  While Plaintiffs explain how the Intel CPU Exploits capitalize on the alleged Defects, *id.* ¶¶ 598-673, they never explain how those supposed Defects are dangerous *in the absence of a specific vulnerability to exploit them*.  *Hauck* correctly rejected precisely this approach: Plaintiffs cannot allege knowledge of a "defect" merely by pointing to "some ... subset of [processor] features" or to Intel CPUs' vulnerability "to side-channel attacks generally" rather than "Spectre-like attacks in particular."  816 F. App'x at 42.

Plaintiffs' bizarre allegations that Intel should have disclosed the *mitigations* years before there was any known mechanism to exploit the "*Defects*" further confirms that they have failed to allege knowledge.  *See, e.g.*, 2AC ¶¶ 62, 129.  Because the mitigations address only the later-discovered Intel CPU Exploits, and not the allegedly pre-existing "Defects," *id.* ¶ 18, those mitigations *could not have existed* back in 2006.  Plaintiffs' allegations that Intel knew about them and should have disclosed them at that time thus necessarily fail.

Despite Plaintiffs' assertion to the contrary, it makes no difference that Intel made different design choices than AMD and that one of the two purported Defects is allegedly unique to Intel.  2AC ¶ 677.  *Hauck* involved AMD's use of one of those exact "Defects" in its design—Incomplete Undo.  816 F. App'x at 42 (addressing "subset of [CPU] features" underlying Spectre); *see also* 2AC ¶ 672; Ex. 3 at 77:9-21 (AMD vulnerable to Spectre because of Incomplete Undo).  And that

design decision is analytically indistinguishable from Unauthorized Access: both are design decisions that were present in CPUs for decades before they could ever be exploited by the Intel CPU Exploits. *See* 2AC ¶¶ 9, 475, 502, 508. The plaintiffs in *Hauck* could not plead AMD's knowledge of any defect, and that same reasoning applies here.

*Hauck* is no outlier in that regard. Countless decisions reject Plaintiffs' premise that later technological developments can render earlier conduct fraudulent in retrospect. *See, e.g.*, *Yastrab v. Apple Inc.*, 173 F. Supp. 3d 972, 979 (N.D. Cal. 2016) (no claim for fraud based on "what the iPhone will or will not do if the software is changed in the future"); *In re Apple Device*, 347 F. Supp. 3d at 461 (reasonable consumers understand that newer software will demand more power and strain battery). That is because courts acknowledge, consistent with *Hauck*, that a manufacturer cannot be "clairvoyan[t] as to unspecified, future technological advancements in the field." *Garcia v. Sony Computer Ent. Am., LLC*, 859 F. Supp. 2d 1056, 1063 (N.D. Cal. 2012). But clairvoyance is exactly what Plaintiffs here demand—that Intel somehow should have known about "Defects" in its design decades before discovery of the Intel CPU Exploits.

Ultimately, Plaintiffs' contention that Intel defrauded and continues to defraud every purchaser of its CPUs since 2006 buckles under its own weight. Under Plaintiffs' theory, whenever a novel security vulnerability is discovered, the failure to have disclosed, years earlier, every design decision that ultimately enabled that vulnerability becomes fraudulent in retrospect. Just as *Hauck* did, this Court should reject that fraud-by-hindsight theory and find that Plaintiffs' failure to satisfy any of the *LiMandri* factors warrants dismissal. *Hauck*, 816 F. App'x at 43; *see*

*also Hauck*, 2019 WL 1493356, at *15 (dismissing UCL "unfair" claim because it "overlap[ped] entirely" with a deficient "fraudulent" prong claim).[12]

### b. Plaintiffs Fail to Allege that Any Omissions Were Material to Reasonable Consumers.

There is a further independent ground to dismiss Plaintiffs' omission-based UCL "unfair" claim: Any alleged omissions were not material, as California law requires. *See Hodsdon*, 891 F.3d at 863. "An omission is material if a reasonable consumer would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015). A statement is immaterial as a matter of law if it is "so obviously unimportant that the jury could not reasonably find that *a reasonable* [*person*] would have been influenced by it." *Engalla v. Permanente Med. Grp. Inc.*, 938 P.2d 903, 919 (Cal. 1997). Plaintiffs fail to plausibly allege that Intel's alleged omissions were materially misleading for two reasons.

*First*, to plead that the omitted information would have been important to a reasonable consumer, Plaintiffs must plausibly allege that the omitted information was inconsistent with a reasonable consumer's expectations. *See, e.g.*, *Punian*, 2016 WL 1029607, at *15. As the Court previously held in the context of standing, Plaintiffs' prior complaint never identified "the parties' bargain that Intel did not meet" and never alleged "that they would have sacrificed … processing speed for additional security against theoretical vulnerabilities." ECF No. 178 at 17-18; *see also*

---

[12] Also as in *Hauck*, Plaintiffs' UCL claim is subject to dismissal for failure to satisfy Rule 9(b). "Rule 9(b)'s heightened pleading standards apply to claims for violations of the … UCL," including under the "unfair" prong, where the claims are "grounded in fraud." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125-27 (9th Cir. 2009). Plaintiffs' UCL "unfair" claim is based on Intel's alleged omissions regarding processor features decades before the vulnerabilities at issue in the case were discovered. 2AC ¶¶ 908-18. *Hauck* rejected precisely the same strategy, finding it failed to comply with Rule 9(b)'s particularity requirements. *See* 816 F. App'x at 42.

*id.* at 33 (noting that the Court would require "more allegations from Plaintiffs about their expectations and alleged bargain relating to the security vulnerabilities").  The Complaint has not remedied that deficiency.  Plaintiffs do not provide the Court with any plausible explanation of the supposed security bargain they expected.  Instead, they still uniformly assert that they expected their devices to be "*free* from potential exploits." *E.g.*, 2AC ¶¶ 51, 63.  Plaintiffs thus continue to insist that they expected both perfect security *and* undiminished performance, indefinitely. *Id.*  But *Hauck* confirms that no *reasonable* consumer could have expected that implausible bargain, and therefore no reasonable consumer would find an alleged omission about theoretical vulnerabilities material.  816 F. App'x at 43; *see also Punian*, 2016 WL 1029607, at *15 (dismissing fraud claims because no reasonable consumer would expect batteries impervious to leakage).[13]

*Second*, Plaintiffs' own allegations about consumers' current buying behavior confirm that any omission could not have been material.  Plaintiffs allege that Intel continues to deceive them regarding the security of its processors and thus that consumers continue to overpay despite widespread knowledge of the Intel CPU Exploits.  2AC ¶¶ 15, 886.  By alleging that purchasers *after* that widespread disclosure are *still* overpaying for Intel processors, however, Plaintiffs fatally undermine their own materiality allegations. *See Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 971 (N.D. Cal. 2008) (materiality requires "plaintiff [to] show that 'had the omitted information been disclosed, one would have been aware of it and behaved differently'" (quoting

---

[13] Plaintiffs' failure to specify the nature of their expected bargain is an independent basis to dismiss under Rule 9(b). *See, e.g.*, *Hovsepian v. Apple, Inc.*, 2009 WL 2591445, at *3 (N.D. Cal. Aug. 21, 2009) ("[G]eneralized allegations with respect to consumer expectations are insufficient to meet Rule 9(b)'s heightened pleading requirements.").

*Falk v. GMC*, 496 F. Supp. 2d 1088, 1095 (N.D. Cal. 2007), *aff'd*, 322 F. App'x 489 (9th Cir. 2009)).

The Ninth Circuit's affirmance in *Hauck* of the dismissal of a Massachusetts Consumer Protection Act omission claim asserted by a plaintiff who bought after January 2018 underscores this point; his purchase at market price *after* the vulnerabilities became public knowledge demonstrated as a matter of law that any information AMD allegedly omitted *could not* have been important to him.  *See* 816 F. App'x at 43.  So too here.  Although the Complaint conspicuously omits the five prior Named Plaintiffs who purchased after public disclosure of Spectre and Meltdown, *see supra* p. 10, those consumers—and millions of others who purchased Intel CPUs after the widespread public disclosure of Spectre and Meltdown in January 2018—remain members of the putative and ever-growing class of allegedly overpaying consumers.  Plaintiffs' allegations that millions of consumers, with full knowledge of Spectre, Meltdown, and their variants, and of the performance impact of patches for those variants—all of which are "well known in the market," *e.g.*, 2AC ¶¶ 61, 67—continue to buy Intel-based devices at allegedly inflated market prices undercuts any claim that any information Intel allegedly failed to disclose is material to reasonable consumers.

### B.    Plaintiffs Have Not Otherwise Alleged Unfair Trade Practices.

Plaintiffs' UCL claim appears to be based entirely on the deficient allegations of fraudulent omissions discussed above.  *See id.* ¶¶ 908-15.  Nonetheless, to the extent Plaintiffs also purport to bring an unfairness claim resting on Intel's design choices and divorced from their allegations of fraudulent omissions, their claim fails anyway.

1.    ***Hauck* Supports Dismissal of Any UCL Claim Premised on Intel's Design Choices.**

In *Hauck*, the Ninth Circuit held that the plaintiffs failed to state a UCL claim against AMD.  816 F. App'x at 42-43.  After finding no material omission, the Ninth Circuit addressed the UCL's "unfair" prong claim only "[t]o the extent" it was not "grounded in fraud."  *Id.*  The court then applied the balancing test and held that the plaintiffs could not state an "unfair" prong claim based on AMD's design choices: "Plaintiffs have not plausibly alleged either the existence of false advertising or an actual violation of a privacy right, nor have they plausibly alleged that the harm represented by the theoretical risk of a cybersecurity flaw that has not yet been successfully exploited outweighs the other benefits of AMD's processor design."  *Id.* at 43.

There is no meaningful difference between the *Hauck* plaintiffs' unfairness allegations and the allegations here.  Plaintiffs here allege that Intel "sacrifice[d] security in favor of speed to gain" a competitive edge.  2AC ¶ 9.  *Hauck* rejected near-identical claims that AMD intentionally sacrificed security for speed: "[The] Defect was the result of AMD's decision to compromise the confidentiality of consumers' most sensitive information to increase the speed and performance levels of its CPUs.  *In short, AMD sacrificed security for speed.*"  Ex. 7 (*Hauck* Compl.) ¶ 3; *see also id.* ¶ 67 ("[C]onsumers purchased AMD CPUs throughout the Class Period unaware that they were sacrificing the security of their sensitive information for increased processing speed."); *id.* ¶ 84 (AMD allegedly pursued performance at the expense of security "in order to gain market share"); *id.* ¶ 175 ("Defendant was aware of the defect in its processors but did not correct the defect prior to sale in order to achieve higher processing speeds in their products, which they then falsely marketed as defect-free.").

Just as in *Hauck*, Plaintiffs cannot plausibly allege that the "theoretical risk of a cybersecurity flaw that has not yet been successfully exploited" outweighs the benefits of a

processor design that, as they acknowledge, offered substantial performance benefits.[14]  *See, e.g.*, 2AC ¶ 589 ("Unauthorized Access" "enhance[d] the processor's performance"); *id.* ¶ 562 (alleging Intel implemented both "Unauthorized Access" and "Incomplete Undo" "to achieve increased speed").  As this Court explained in dismissing the prior complaint, "Plaintiffs only allege that Intel made design choices to sacrifice security against potential side-channel attacks that had not yet been discovered to improve *actual* processing speed and performance."  Order at 20 (emphasis in original).  Especially because Plaintiffs themselves highlight that users "*really* care about speed in interactive environments" and that "milliseconds matter," 2AC ¶¶ 738-48 (emphasis in original), Intel's alleged design decision prioritizing speed cannot be unfair.

Equally insufficient are Plaintiffs' allegations that only Intel made the design choices underlying Unauthorized Access.  *Id.* ¶ 677.  Both "Unauthorized Access" and "Incomplete Undo" were design decisions allegedly made to improve performance; both were present in Intel CPUs for more than a decade before researchers discovered any of the Intel CPU Exploits; and both are said to allow an attacker to leverage speculative execution in a manner that may reveal confidential information.  *See id.* ¶¶ 9, 475, 502, 508.  Unauthorized Access and Incomplete Undo are thus indistinguishable in all respects that could possibly matter to a reasonable consumer, and neither is sufficient to state a claim that Intel designed its processors in an "unfair" manner.

### 2.    California Law Similarly Bars Any Unfair Design Choice Theory.

Independent of *Hauck*, any "unfair design choice" theory fails under established California law.  In *Bardin v. DaimlerChrysler Corp.*, the plaintiffs alleged that Chrysler deliberately designed

---

[14] Plaintiffs also have not alleged "false advertising" to support their UCL claim—to the contrary, they have repeatedly expressly disclaimed relying on affirmative misrepresentations in connection with their nationwide claims.  *See* ECF No. 147 at 19 n.13; ECF No. 192 at 20 & n.12; Order at 10 n.3.  Nor have they alleged any "violation of a privacy right" because none alleges a data breach.

its cars with cheaper parts to increase profits and gain market share.  39 Cal. Rptr. 3d 634, 637 (Ct. App. 2006).  The parts allegedly fell below the industry standard, and the plaintiffs claimed they were not aware of Chrysler's design tradeoff at the time of purchase.  *Id.*  Nonetheless, the California Court of Appeal held, as a matter of law, that Chrysler's design decision was not an unfair business practice in the absence of any physical injury, affirmative misrepresentation, or breach of warranty.  *Id.* at 643-44.  Plaintiffs do not allege any of those prerequisites exist here.

Like *Hauck*, *Bardin* examined the substance rather than the label of the plaintiffs' unfair business practices claim, and recognized that the plaintiffs were trying to pursue a strict products-liability claim without alleging the physical injury or property damage such claims require.  Strict liability doctrine ensures that consumers can be compensated for *physical* damage to themselves or their property without having to bargain for a warranty to that effect.  But a consumer is not entitled to a guarantee "that [a] product will … match his economic expectations unless the manufacturer agrees that it will" by offering a warranty.  *Seely v. White Motor Co.*, 403 P.2d 145, 151 (Cal. 1965).  For this reason, *Bardin* held that a plaintiff may not use the UCL "unfair" prong as an end-run around the physical injury requirement of products-liability law.  *See* 39 Cal. Rptr. 3d at 644.

Plaintiffs' unfair design choice theory, too, sounds in strict liability and therefore fails.  A seller may be strictly liable for a design defect when "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller."  *Trejo v. Johnson & Johnson*, 220 Cal. Rptr. 3d 127, 154 (Ct. App. 2017).  This is exactly the argument Plaintiffs make in support of their unfair trade practices claim.  *See, e.g.*, 2AC ¶ 909 (alleging that Intel committed an unfair trade practice by failing to "redesign[] its CPUs to fix the Defect").  Under *Bardin*, this argument must be presented as a strict liability claim (and

meet the requirements for that claim: physical injury or property damage); it cannot advance as "unfairness."

Plaintiffs posit that a product may be "defective," and selling it may therefore be "unfair," even if the product (i) is fit for ordinary use (i.e., breaches no implied warranty), (ii) functions as represented at the time of sale (i.e., breaches no express warranty), and (iii) poses no physical safety risk.  They argue that Intel's conduct was "unfair" because, they claim, Intel traded (theoretical) security for (actual) speed.  2AC ¶¶ 562, 589, 908-15; *see also* Order at 20.  But design tradeoffs are inevitable in any manufactured product (such as the tradeoff between affordability and durability discussed in *Bardin*).  This is especially true for complex computing devices.  *See, e.g.*, *In re Apple Device*, 347 F. Supp. 3d at 461 (discussing tradeoff between smartphone performance and power consumption).  On Plaintiffs' view, every such decision can give rise to benefit-of-the-bargain damages, if a buyer believes later that the tradeoff was "unfair." A litigant could drag courts into deciding the "right" level of security, performance, power consumption, durability, and so on for every product.  That is not the law.

The Court should follow *Hauck* and *Bardin* and reject Plaintiffs' attempt to shoehorn a no-injury products-liability claim into the UCL.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT (COUNT II).

As before, Plaintiffs' unjust enrichment claim fails because they have not identified any actionable omission, nor any other independent ground "why Intel's retention of the benefit conferred is unjust."  Order at 24.[15]

---

[15] Plaintiffs designate their claim as "Quasi Contract or Unjust Enrichment."  "'Quasi-contract' is simply another way of describing the basis for the equitable remedy of restitution when an unjust enrichment has occurred."  *McBride v. Boughton*, 20 Cal. Rptr. 3d 115, 122 n.6 (Ct. App. 2004). It thus does not constitute a separate or different basis for relief than "unjust enrichment."

Recovery for unjust enrichment requires that a plaintiff plead an independently "actionable wrong." *Hill v. Roll Int'l Corp.*, 128 Cal. Rptr. 3d 109, 118 (Ct. App. 2011); *see also Sanders*, 672 F. Supp. 2d at 989 (holding an unjust enrichment claim "will depend upon the viability of the Plaintiffs' other claims"). The only allegedly "actionable wrong" Plaintiffs assert in support of their unjust enrichment claim is Intel's alleged failure to disclose the purported Defects. *See* 2AC ¶ 935 ("By withholding the facts concerning the defective CPUs, Intel put its own interests ahead of [purchasers] … and benefitted itself to the detriment of Plaintiffs and absent Class members."). Because that alleged omission is not actionable, *see supra* pp. 14-29, Plaintiffs' unjust enrichment claim necessarily fails. *See Oestreicher*, 544 F. Supp. 2d at 975 ("[S]ince plaintiff's fraud-based claims have been dismissed, plaintiff has no basis for its unjust enrichment claim.").

Plaintiffs have identified no other reason "why Intel's retention of the benefit conferred is unjust." Order at 24. Plaintiffs now add that they have "unfairly incur[red] substantial time and/or costs to mitigate, replace if necessary, and monitor the devices with Intel CPUs to minimize the security risks to their private data." 2AC ¶ 938. But that is an alleged *detriment to Plaintiffs* (which, if proven, plainly would be remediable by damages), not a *"benefit conferred"* on Intel, as required to establish a right to relief for unjust enrichment. *See, e.g.*, *Sanders*, 672 F. Supp. 2d at 989 ("To plead a claim for unjust enrichment, a plaintiff must allege a receipt of a benefit and unjust retention of the benefit at the expense of another.").

Plaintiffs' newly proposed remedy of nonrestitutionary disgorgement, 2AC ¶ 939, cannot revitalize this claim.[16] Without an "actionable wrong," there is no basis for relief, however

---

[16] Nonrestitutionary disgorgement involves the disgorgement of profits from the defendant to the plaintiff, who "does not have an ownership interest" in those amounts, while restitution involves restoring monies to the plaintiff "in which he or she has an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 946, 947 (Cal. 2003).

characterized.  In any event, the claim of unjust enrichment here arises from alleged overcharging. *Id.* ¶ 936 (alleging Intel "was able to charge Plaintiffs and Class members more than it otherwise could have" as a result of the alleged omission).  As explained below, in such circumstances the equitable remedies of restitution and nonrestitutionary disgorgement, and the legal remedy of damages, are the same, such that *all* equitable remedies (including for unjust enrichment) are unavailable under *Sonner*.  *See infra* pp. 37-38.

## III.    THE COURT SHOULD AGAIN DISMISS COUNTS I AND II UNDER *SONNER* BECAUSE PLAINTIFFS HAVE AN ADEQUATE LEGAL REMEDY.

In their prior complaint, Plaintiffs sought various forms of equitable relief, including restitution, declaratory relief, and injunctive relief for their UCL claim, and restitution for their unjust enrichment claim.  ECF No. 181 ¶¶ 834, 851.  The Court dismissed both claims based on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020).  Order at 23.  Because *Sonner* was so recent, however, the Court permitted Plaintiffs to amend and "explain why they do not have an adequate remedy at law."  *Id.* at 23.  Plaintiffs have not done so.  Instead, they hedge that their legal remedies "*may* be inadequate" and suggest the Court should defer the inquiry to some later, undefined time.  2AC ¶¶ 921-22, 942-43.  As the Court already concluded, the *Sonner* inquiry is properly resolved on the pleadings.  Order at 23-24 (citing *Zaback v. Kellogg Sales Co.*, 2020 WL 6381987, at *4 (S.D. Cal. Oct. 29, 2020)).  Here, Plaintiffs' own allegations establish that their legal and equitable claims rest on the same facts and seek the same relief, such that their equitable claims are barred under *Sonner*.  Plaintiffs' counterfactual and unworkable request for injunctive relief does not alter that conclusion.

Plaintiffs bear the burden of showing that a legal remedy is inadequate—"[t]he law does not recognize a presumption of inadequacy that defendant must affirmatively refute."  *Hassell v. Uber Techs., Inc.*, 2020 WL 7173218, at *9 (N.D. Cal. Dec. 7, 2020).  Because Plaintiffs have

failed to meet that burden, the Court should dismiss both remaining nationwide claims with prejudice. *See Drake v. Toyota Motor Corp.*, 2021 WL 2024860, at *6 (C.D. Cal. May 17, 2021) (dismissing with prejudice where plaintiffs provided no "substantive allegations" demonstrating inadequacy of legal remedies).

### A.     Plaintiffs Cannot Evade Application of *Sonner* Through Speculation or Alleged Uncertainty as to Their Legal Claims.

The Court directed Plaintiffs to "explain why they *do not* have an adequate remedy at law." Order at 23. Plaintiffs do not even purport to meet this test, alleging only that their legal remedies "*may* be inadequate." 2AC ¶¶ 921, 942. Plaintiffs' equivocation does not satisfy the Court's clear direction. Order at 23; *see also Julian v. TTE Tech., Inc.*, 2020 WL 6743912, at *4 (N.D. Cal. Nov. 17, 2020) (mere "speculat[ion] that restitution and damages could be different" does not suffice to establish inadequacy of legal remedies); *Rhynes v. Stryker Corp.*, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011) (where plaintiff "*may*" have adequate remedy at law, "equitable relief is *unavailable*"). Plaintiffs also suggest they require more time to address the issue, asserting they "do not know at this juncture" whether damages "will be viable or will adequately compensate" them for their "imprecise or uncertain" damages. 2AC ¶¶ 921-22, 942-43. But that argument would eviscerate *Sonner*; every plaintiff could make that claim, all the way through trial. That is why courts—including this Court, Order at 24—routinely reject that argument and apply *Sonner* at the pleading stage. *E.g.*, *Sharma v. Volkswagen AG*, 2021 WL 912271, at *7-9 (N.D. Cal. Mar. 9, 2021) (rejecting plaintiff's argument that damages and restitution were "not equally certain").[17]

---

[17] *See also Clark v. Am. Honda Motor Co.*, 2021 WL 1186338, at *7-8 (C.D. Cal. Mar. 25, 2021) ("[N]othing about [*Sonner*] suggests its reasoning applies *only* late in the case and not at the pleading stage." (emphasis in original)); *In re MacBook Keyboard Litig.*, 2020 WL 6047253, at *2 (N.D. Cal. Oct. 13, 2020) (applying *Sonner* "is not premature on a motion to dismiss"). Just as the Court did, other courts have specifically rejected the "wait-and-see approach" that Plaintiffs advocate here. *Barrett v. Apple Inc.*, 2021 WL 827235, at *17-18 (N.D. Cal. Mar. 4, 2021).

**B.**     ***Sonner* Applies Because Plaintiffs' Legal and Equitable Claims Rest on the Same Facts and Same Legal Theories, and Seek the Same Relief.**

The Complaint expands on the equitable remedies Plaintiffs seek, but offers no explanation as to why those equitable remedies are distinct from Plaintiffs' legal remedy.[18]  Instead, Plaintiffs' equitable claims continue to rest on the same operative facts, pursue the same legal theories, and seek the same relief as their legal claims.  For example, Plaintiffs make the same core allegation of concealment—that Intel "implemented the Unauthorized Access Defect and chose to keep its decision strictly confidential"—in support of their legal *and* equitable claims.  2AC ¶ 909 (UCL claim), *id.* ¶ 928 (unjust enrichment), *id.* ¶¶ 1061(a), 1119, 1130, 1372(a), 1393, 1433(a), 1445, 1571(a) (bellwether state-law claims).  But "legal and equitable claims based on the same factual predicates are not true alternative theories of relief." *Rodriguez v. Just Brands USA, Inc.*, 2021 WL 1985031, at *8 (C.D. Cal. May 18, 2021) (dismissing UCL claim under *Sonner*); *see Williams v. Apple, Inc.*, 2020 WL 6743911, at *9 (N.D. Cal. Nov. 17, 2020) (dismissing with prejudice UCL claim that was "duplicative" of and "based on the same factual predicate" as legal claims).

Plaintiffs similarly allege the same injury underpins their legal and equitable claims: "lost money or property" due to "overcharging."  *See, e.g.*, 2AC ¶ 918 (alleging for UCL claim that Plaintiffs "lost money or property"); ¶ 936 (alleging Intel was "unjustly enriched by overcharging for those CPUs"); ¶¶ 1064, 1124, 1133, 1376, 1396, 1438, 1449, 1575 (alleging for each bellwether state-law claim that Plaintiffs suffered "losses of money or property").  The enterprise plaintiffs likewise allege that they "would have paid less for" Intel's CPUs, and further allege that they have "incur[red] time and costs" associated with monitoring, patching, and upgrading.  *E.g.*, 2AC ¶¶ 94-95.  Such allegations of a "*loss of money* and/or *loss in value*" from a purchased product are

---

[18] Plaintiffs seek the same UCL remedies as before but, as noted above, add a request for "non-restitutionary disgorgement" to their unjust enrichment claim.  2AC ¶¶ 919, 939.

"exactly the type of injury for which legal remedies are appropriate." *Sharma*, 2021 WL 912271, at *8; *see also Gibson v. Jaguar Land Rover N. Am., LLC*, 2020 WL 5492990, at *3 (C.D. Cal. Sept. 9, 2020) (dismissing equitable claims because allegations of "lost money or property" do not suffice to establish that "monetary damages would not make [plaintiffs] whole").

Plaintiffs' allegations also demonstrate that the *measure* of their alleged harm is the same for their legal and equitable claims: the alleged difference in the value of the CPUs as represented and as received. *See, e.g.*, 2AC ¶ 892(g) (alleging, as common question, whether class members "overpaid" for Intel CPUs), ¶ 911 (alleging, for UCL claim, that Intel sold CPUs "at a premium price"), ¶ 915 (alleging, for UCL claim, sales "at a substantial premium"), ¶ 936 (alleging, for unjust enrichment claim, "overcharging"); ¶ 1061(b) (alleging, for Florida bellwether claim, sales at a "premium price").[19] A price differential is a traditional measure of *damages*. *See, e.g.*, *Julian*, 2020 WL 6743912, at *5 (holding damages are "the same as what may be obtained as restitution" where purchasers claim a price differential between the product as represented and as received). Because Plaintiffs' allegations show their injuries "are financial" and so "can be cured by the monetary damages, *i.e.*, *legal relief*," they have failed to offer "plausible allegations explaining *why* [their] legal remedies are inadequate." *Clark v. Eddie Bauer LLC*, 2021 WL 1222521, at *4 (W.D. Wash. Apr. 1, 2021) (dismissing with prejudice under *Sonner*).

---

[19] This is equally true for restitution and nonrestitutionary disgorgement. When the alleged harm is the "price premium paid by all misled purchasers," the two are "functionally the same remedy." *Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531, 535 (9th Cir. 2016) (holding that, in cases alleging price premium, the "wrongfully obtained profits are equal to the victims' losses: the total price premium paid by all misled purchasers").

C.     **Plaintiffs' Request for Injunctive Relief Under the UCL Does Not Salvage Their Equitable Claims.**

Plaintiffs seek an injunction "requiring Intel to cease (1) representing that the Intel CPU Exploits are industry-wide problems, and (2) selling, distributing, and shipping CPUs that contain the Defects." 2AC ¶ 919. Neither request for relief establishes that Plaintiffs "do not have an adequate remedy at law." Order at 23.

Post-*Sonner* cases hold that the requirement that a plaintiff establish the inadequacy of legal remedies applies equally to a request for injunctive relief. *See, e.g.*, *In re MacBook Keyboard Litig.*, 2020 WL 6047253, at *3 (N.D. Cal. Oct. 13, 2020) (putative consumer class action seeking injunction; "monetary damages are an adequate remedy for claims based on an alleged product defect"); *Adams v. Cole Haan, LLC*, 2020 WL 5648605, at *2 (C.D. Cal. Sept. 3, 2020) (same; there is no *Sonner* "exception for injunctions"); *Drake*, 2021 WL 2024860, at *7 (same; "there is no reason to think legal remedies, like damages, will not be sufficient to make future plaintiffs whole"); *Clark v. Am. Honda Motor Co.*, 2021 WL 1186338, at *8 (C.D. Cal. Mar. 25, 2021) (same; "[o]nce those future purchasers purchase their vehicles, damages will be as adequate a remedy for them as it will be for currently-existing purchasers."). In all of these cases, the requests for injunctive relief were dismissed at the pleadings stage.

Courts have applied *Sonner* to bar claims seeking injunctions similar to those requested by Plaintiffs here. For example, in *Huynh v. Quora, Inc.*, the plaintiffs sought an injunction mandating "industry-standard practices for protection" of user data and disclosures about the information exposed in a data breach. --- F. Supp. 3d ---, 2020 WL 7495097, at *19 (N.D. Cal. Dec. 21, 2020). The court denied the injunction, concluding that the claimed harms were remediable through money damages. *Id.* Similarly, in *Adams*, the plaintiffs alleged that Cole Haan engaged in a deceptive pricing scheme and asked the court to enjoin the defendant from

"continuing" its allegedly ongoing "unfair practices in violation of the UCL in the future." 2020 WL 5648605, at *3; *compare* 2AC ¶ 922 (claiming "continuing and ongoing" injury). But because "the injury that [plaintiffs] allege[] is 'lost money,' a form of harm for which legal damages does seem to be an adequate remedy," the court held that *Sonner* barred the UCL claim at the pleadings stage. *Adams*, 2020 WL 5648605, at *3. Here, as in *Huynh* and *Adams*, any damages arising from Intel's future sale of allegedly defective CPUs or future representations about those CPUs can be remedied through damages, meaning Plaintiffs *cannot* allege irreparable harm.

Moreover, the specific injunctive relief Plaintiffs now request would defy basic equitable principles. *See League of Wilderness Defs. v. Connaughton*, 2014 WL12792263, at *3 (D. Or. Aug. 7, 2014) ("Injunctive relief must be narrowly tailored to remedy the specific harm alleged."). Plaintiffs' request for the Court to bar Intel from "selling, distributing, and shipping CPUs" with the alleged Defects, 2AC ¶ 919—which Plaintiffs contend includes *all* of Intel's current line of chips, *e.g.*, *id.* ¶ 886—would be wildly overbroad and would deny millions of consumers the ability to judge for themselves whether Intel's chips are worth the price. Especially in light of Plaintiffs' own allegations that the "Defects" are now public knowledge, *e.g.*, *id.* ¶ 910, it is preposterous even to suggest such an injunction.

Plaintiffs' request to enjoin Intel from stating that the exploits discovered in 2017 are an industry-wide problem is similarly a non-starter. First, as discussed *supra* pp. 7-8, Plaintiffs themselves allege that the Intel CPU Exploits affect all manufacturers to one degree or another, 2AC ¶¶ 677, 694. And second, Plaintiffs expressly concede that the Intel CPU Exploits are now "well known in the market," *e.g.*, *id.* ¶¶ 61, 67—with the necessary corollary that the alleged omission underlying their UCL claim cannot form the basis for *any* future relief, whether legal or equitable. Plaintiffs seek to avoid that concession by asserting that they "expect that Intel will

continue to misrepresent or conceal defects in those processors." 2AC ¶ 895.[20]  But as the Court already concluded, Plaintiffs' assertion that there *may* be future defects that Intel *may* conceal is "unduly speculative" and would not even suffice to establish standing for injunctive relief.  ECF No. 178 at 18 (finding Plaintiffs' allegation "that they 'expect' that Intel will conceal or mispresent defects in future products" is "too vague and imprecise to support standing").  It certainly does not satisfy *Sonner*.  *See Shay v. Apple Inc.*, 2021 WL 1733385, at *5 (S.D. Cal. May 3, 2021) ("A contingent event does not support an allegation that Plaintiff has an inadequate remedy at law.").

### D.    Plaintiffs Cannot Use Equitable Remedies to Salvage Lost Legal Claims.

Plaintiffs contend that their nationwide equitable claims should advance because their nationwide legal claims have been dismissed.  2AC ¶¶ 434, 920, 940.  But the dismissal of a legal *claim* does not make a legal *remedy* inadequate.  *See, e.g.*, *N.K. Collins, LLC v. William Grant & Sons, Inc.*, 472 F. Supp. 3d 806, 830 (D. Haw. 2020) (explaining that, "[t]o hold otherwise would enable any losing plaintiff to convert the lost legal claim into" an equitable one).  Instead, in assessing the adequacy of legal remedies, "[t]he relevant question" is "not whether [Plaintiffs] ha[ve] *pleaded* legal remedies, but whether [they] could have *sought* an adequate legal remedy." *Guzman v. Polaris Indus. Inc.*, 2021 WL 2021454, at *12 (C.D. Cal. May 12, 2021).

Here, Plaintiffs not only *could* have sought legal remedies under California law, they *did*. That the Court held those claims to be legally deficient, and so *unavailable*, Order at 20-21, does

---

[20] This allegation highlights a separate bar to Plaintiffs' requested relief.  Their proposed injunction would require extensive and long-term judicial oversight of every iteration of Intel's microarchitecture to determine whether any design has some heretofore unknown or undisclosed "defect."  Courts regularly deny such unbounded injunctive relief.  *Nat'l Res. Def. Council v. EPA*, 966 F.2d 1292, 1300 (9th Cir. 1992) ("Injunctive relief may be inappropriate where it requires constant supervision'"; declining to engage in the "active management of such a remedy"); *Univ. Acct. Servs., LLC v. Schulton*, 2020 WL 2393856, at *21 (D. Or. May 11, 2020) ("injunctive relief [that] would likely involve extraordinary supervision by the Court" is "inappropriate").

not retroactively render those remedies *inadequate* under *Sonner*.  *See, e.g.*, *Jones v. Tracfone Wireless, Inc.*, 2021 WL 411347, at *2 (N.D. Cal. Feb. 4, 2021) (concluding plaintiff "failed to plead that he lacks an adequate remedy at law" to support equitable claim even though all legal claims were simultaneously dismissed); *Franckowiak v. Scenario Cockram USA, Inc.*, 2020 WL 9071697, at *3 (C.D. Cal. Nov. 30, 2020) ("[P]laintiffs cannot persuasively argue that they lack an adequate remedy at law even when their claims … are barred by the statute of limitations."). Indeed, that rule was well-established even before *Sonner*.  In *Robinson v. C.R. Bard, Inc.*, 2016 WL 3361825, at *3 (N.D. Cal. June 17, 2016), for example, the court dismissed the plaintiff's UCL claim because an adequate remedy at law existed through the compensatory damages sought by the plaintiff, even though all legal claims were simultaneously dismissed as time-barred.[21]

## IV.    PLAINTIFFS FAIL TO STATE ANY BELLWETHER CLAIM.

For purposes of this motion, the Court ordered (per the parties' stipulation) that each side address the same six statutory subclass claims addressed previously.  ECF No. 212.[22]  For the same reasons set forth in the Order, all of these claims—whether for omissions, affirmative misrepresentations, "unfairness," or "unconscionability"—fail as a matter of law.[23]

---

[21] *See also In re Ford Tailgate Litig.*, 2014 WL 1007066, at *5 (N.D. Cal. Mar. 12, 2014) ("Should plaintiffs ultimately be unable to recover under either a contract or tort theory, it does not mean a legal remedy was unavailable … but only that their claim lacks merit."); *Rhynes*, 2011 WL 2149095, at *4 ("Plaintiffs' argument that they will have no adequate remedy at law if their other claims fail is unavailing.  Where the claims pleaded by a plaintiff *may* entitle her to an adequate remedy at law, equitable relief is unavailable.").

[22] Those are Count XI (Florida Deceptive and Unfair Trade Practices Act, "FDUTPA"), Count XVI (Illinois Consumer Fraud and Deceptive Business Practices Act, "ICFA"), Count XXXV (New Jersey Consumer Fraud Act, "NJCFA"), Count XXXVII (New York General Business Law, "NYGBL"), Count XL (Ohio Consumer Sales Practices Act, "OCSPA"), and Count XLIX (Texas Deceptive Trade Practices Act, "TDTPA").

[23] Plaintiffs seek equitable relief (including restitution or injunctive relief) on each bellwether state-law claim.  *See, e.g.*, 2AC ¶¶ 1065-66, 1125-26, 1377-78, 1399-1400, 1439-40, 1578-79. Such remedies are unavailable under *Sonner* for the same reasons as discussed *supra* pp. 35-42.

### A.      Plaintiffs Do Not State a Bellwether Omissions Claim.

Plaintiffs' bellwether omissions claims fail for the same reasons as their UCL omissions claim:

*First*, the Court previously dismissed all bellwether omission claims because the alleged "Defects" underlying those claims "were known in the industry."  Order at 30.  The Court granted Plaintiffs leave to amend "if they can allege that the Unauthorized Access defect was not publicly disclosed, contrary to Plaintiffs' current allegations and admissions." *Id.*  For the reasons discussed *supra* pp. 15-21, Plaintiffs have not successfully retracted their prior admissions and therefore cannot state any bellwether omissions claim.

*Second*, *Hauck*'s reasoning makes clear that an omission claim based solely on the nondisclosure of a design choice, independent of a specific vulnerability such as Spectre, does not satisfy the knowledge requirements for a fraud claim.  *See supra* pp. 23-27; *see also Hauck*, 816 F. App'x at 42 (rejecting hindsight-driven effort to define a "subset of ... features" as a "defect").[24] Thus, the claims of all bellwether Named Plaintiffs who purchased their Intel CPUs before Intel

---

[24] Like California, all bellwether states similarly require knowledge to support a fraudulent omission claim.  *See Hauck*, 2019 WL 1493356, at *17 (under FDUTPA, "a manufacturer must have known of the defect at the time of sale for a plaintiff to state a claim for fraud by omission" (citing *Matthews v. Am. Honda Motor Co.*, 2012 WL 2520675, at *3 (S.D. Fla. June 6, 2012))); *Rockford Mem'l Hosp. v. Havrilesko*, 858 N.E.2d 56, 62 (Ill. App. Ct. 2006) ("[F]or a material omission to be actionable [under the ICFA], the plaintiff must establish that the fact concealed was *known* to the defendant at the time of the concealment."); N.J. Stat. Ann. § 56:8-2 (NJCFA provision prohibiting "the *knowing*[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression[] or omission"); *In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352, 359-60 (S.D.N.Y. 2016) (granting motion to dismiss NYGBL omission claim when plaintiff failed to plead defendant's "knowledge of the information [p]laintiffs allege it failed to disclose at the time [p]laintiffs made their purchases"); *Kondash v. Kia Motors Am., Inc.*, 2016 WL 11246421, at *11 (S.D. Ohio June 24, 2016) (OCSPA omissions claim requires that plaintiff allege the "manufacturer knew of design defects and failed to disclose ... defects [that] existed at the time of sale"); *Washburn v. Sterling McCall Ford*, 521 S.W.3d 871, 876 (Tex. App. 2017) (dealership could not be liable for omissions when it was unaware at time of sale of manufacturer's warranty restriction; "should have known" allegations are insufficient).

learned of any of the Intel CPU Exploits—*i.e.*, all but Named Plaintiff Dunn—fail for this reason, too.  2AC ¶¶ 96-97, 124, 130, 211, 223, 318, 324, 381, 669.

*Third*, Rule 9(b) also requires Plaintiffs, under any state's law, to specify the bargain Intel allegedly failed to fulfill.  *See, e.g.*, *Hovsepian v. Apple, Inc.*, 2009 WL 2591445, at *3 (N.D. Cal. Aug. 21, 2009) ("[G]eneralized allegations with respect to consumer expectations are insufficient to meet Rule 9(b)'s heightened pleading requirements.").  No bellwether Plaintiff has done so.

*Fourth*, *Hauck*'s reasoning compels dismissal of all bellwether omissions claims because each state statute at issue requires that omitted information be material.  *Hauck* expressly affirmed the dismissal of a FDUTPA claim (which requires an omission that is likely to mislead consumers "acting reasonably in the circumstances"), because no reasonable consumer expects a device to be "completely impervious to novel cybersecurity threats," and therefore AMD's alleged nondisclosure was not "likely to mislead."  816 F. App'x at 43 (quoting *PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773, 777 (Fla. 2003)).  The same result follows in the other five states, all of which require that the omitted information be material.[25]  *See supra* pp. 27-29 (explaining why the alleged omission here was not material as a matter of law).

---

[25] *See Karpowicz v. GMC*, 1997 WL 413929, at *6 (N.D. Ill. July 18, 1997) (omission is only actionable under the ICFA if it is *material*, meaning plaintiff would have acted differently had it been disclosed or the information was of the type on which a buyer would be expected to rely in purchasing); *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 99-100 (D.N.J. 2011) (NJCFA requires plaintiff to plead that product failed to meet *objectively reasonable* expectations); *Gomez-Jimenez v. N.Y. Law Sch.*, 956 N.Y.S.2d 54, 58 (App. Div. 2012) (NYGBL omissions claim requires that defendant "alone possesse[d] *material* information that is relevant to the consumer and fail[ed] to provide this information" (citing, *e.g.*, *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995)); *Grgat v. Giant Eagle, Inc.*, 135 N.E.3d 846, 850-51 (Ohio Ct. App. 2019) (OCSPA omissions claim requires allegations that *reasonable* consumer would have been deceived); Tex. Bus. & Com. Code § 17.46(b)(24) (TDTPA omissions claim requires non-disclosure of *material* information such that consumer would not have entered transaction had they known it).

### B.    Plaintiffs Do Not State a Bellwether Affirmative Misrepresentation Claim.

In its last order, the Court recognized that under the law of each of the bellwether states, a plaintiff asserting a consumer protection claim based on an affirmative misrepresentation must allege that he or she saw or heard the alleged statement.  *See* Order at 25-29 (collecting cases).  A plaintiff cannot plead either reliance or proximate causation—one or both of which are required for each bellwether claim—without alleging that she actually saw or heard the alleged misrepresentation.  *Id.*; *see Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1084 (N.D. Cal. 2017) (dismissing affirmative misrepresentation claim because plaintiffs "do not allege with particularity any advertisements on which they relied"), *aff'd*, 731 F. App'x 719 (9th Cir. 2018).[26]

Plaintiffs do not even attempt to remedy this fatal flaw.  They add no allegations of any specific representations by Intel seen or heard by any Named Plaintiff.  Instead, the Named Plaintiffs repeat the same formulaic allegation that they "reviewed and relied" on unspecified information about their device "that was displayed" online or in the store, "researched the devices" by reviewing unspecified website or marketing materials, and "heard" and/or "read" that Intel processors were the industry performance leader.  *See, e.g.*, 2AC ¶¶ 89, 130, 223, 318, 381.  As the Court held, this is "insufficient."  Order at 29.  The current allegations are identical to those

---

[26] This principle precludes Plaintiffs' claims under the substantive law of each of the bellwether states.  It also precludes those claims under Rule 9(b), which requires that any affirmative misrepresentation claim be supported by allegations of a specific misleading representation that the plaintiff heard or read.  *See, e.g.*, *Kearns*, 567 F.3d at 1125-26 (upholding dismissal where plaintiff did not specify the content of any statement viewed or relied upon); *Tabler v. Panera LLC*, 2020 WL 3544988, at *8 (N.D. Cal. June 30, 2020) (dismissing under Rule 9(b) where plaintiff "merely identifies a range of representative advertisements that Plaintiff alleges to be misleading, but Plaintiff provides no indication of which statements, if any, Plaintiff herself relied upon").  Courts in this Circuit routinely apply Rule 9(b) to state-law consumer protection claims.  *E.g.*, *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 957 (C.D. Cal. 2012) (NYGBL, FDUTPA, and others); *Hauck*, 2019 WL 1493356, at *11 (FDUTPA); *Kearney v. Equilon Enters., LLC*, 65 F. Supp. 3d 1033, 1041-42 (D. Or. 2014) (various).

the Court previously rejected as "either general statements about speed or performance, which are unrelated to security, are too vague and general to be actionable, or are mere puffery." *Id.*; *compare, e.g.*, ECF No. 181 ¶¶ 73, 114, 205, 292, 348 (setting forth the same allegations regarding what Named Plaintiffs saw or heard as those set forth above).

Even if Plaintiffs had tied the specific Intel marketing statements described in the Complaint to any Named Plaintiff, they would still fail to state a claim, because none of those advertisements contained any actionable misrepresentation. In *Hauck*, the Ninth Circuit examined substantively identical statements by AMD regarding some of the same processor vulnerabilities that are at issue here—marketing materials in which AMD described its "[s]trong, hardware-based security," asserted that its devices "help ensure sensitive data is protected 24/7/365," and stated that "AMD's robust silicon-level security features are competitive, consistent, and comprehensive," among other representations—and held that none of these statements were "likely to mislead consumers acting reasonably in the circumstances" because "consumers would not plausibly believe … that their devices would be completely impervious to novel cybersecurity threats." *Hauck*, 816 F. App'x at 43 (internal quotation marks omitted) (applying Florida and Massachusetts law); Ex. 7 (*Hauck* Compl.) ¶¶ 92, 94. The same is true here, with respect to materially indistinguishable statements by Intel.[27]

---

[27] For that matter, even in litigation against *Intel* and relating to *the same vulnerabilities*, the same marketing materials have been found inadequate to state a plausible claim of affirmative misrepresentations. In *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *9 (N.D. Cal. Mar. 29, 2019), the court dismissed a putative securities class action against Intel arising from the discovery of Spectre and Meltdown. As the court there held, statements touting Intel processors' "advanced security features," which "have the ability to protect against identity breaches," and make it "easy to secure all your data," among similar representations, "constitute vague positive statements which are immaterial as a matter of law" and are "not actionable" "[b]ecause the Court cannot quantify [them] for their truth or falsity." *Id.* In an earlier action, too, the Illinois Supreme Court similarly considered Intel's representation that its processor was "the best and fastest on the market" and agreed that "this implicit representation is nothing more than puffery, and therefore

## C.    Plaintiffs State No Bellwether "Unfair" or "Unconscionable" Claim.

The Court previously concluded that, because "Plaintiffs fail to allege any actionable omissions or misrepresentations, Plaintiffs fail to allege any conduct by Intel supporting a claim for alleged unfair conduct or unconscionable conduct under these statutes." Order at 30. The same result is called for here.

The bellwether "unfair" and "unconscionable" claims also fail for the following additional reasons:

*Unfair conduct (Florida, Illinois, Ohio)*.  *Hauck's* analysis forecloses a claim for "unfair" trade practices under Florida, Illinois, and Ohio law, as each of those states, in assessing allegedly unfair practices, looks to the standard articulated by the Federal Trade Commission. Fla. Stat. § 501.203(3)(b); 815 Ill. Comp. Stat. 505/2; Ohio Rev. Code Ann. § 1345.02(C).[28]  The FTC standard requires that the defendant's conduct "offend[] established public policy" and be "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *See, e.g.*, *PNR*, 842 So. 2d at 777. That is the precise standard the Ninth Circuit applied in rejecting materially identical claims of unfair conduct in *Hauck*. 816 F. App'x at 43 (quoting *PNR*, 842 So. 2d at 777). Allegations failing to meet this standard should be dismissed, as "the harm represented

---

is not a 'deceptive act' within the purview of the [IFCA]." *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 926 (Ill. 2007).

[28] Plaintiffs' claims of unfair and unconscionable conduct suffer an additional defect under Ohio law: "To pursue a class action claim under the OCSPA, plaintiff must allege that defendant had prior notice that its conduct was deceptive or unconscionable," which requires a plaintiff to allege "either that a specific rule or regulation has been promulgated [by the Ohio Attorney General] under R.C. 1345.05 that specifically characterizes the challenged practice as unfair or deceptive, or that an Ohio state court has found the specific practice either unconscionable or deceptive in a decision open to public inspection." *Pattie v. Coach, Inc.*, 29 F. Supp. 3d 1051, 1055 (N.D. Ohio 2014) (alteration in original). Failure to plead prior notice "requires dismissal of class action allegations." *Id.* (citation omitted). Plaintiffs purport to pursue a class action claim under the OCSPA, 2AC ¶ 1427, but fail to include the mandatory allegations regarding notice.

by the theoretical risk of a cybersecurity flaw that has not yet been successfully exploited" cannot, as a matter of law, plausibly "outweigh[] the other benefits" of Intel's CPU design. *Id.*; *see also Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 830, 834-35 (7th Cir. 2014). That is especially true where the alleged "Defects"—i.e., Intel's design choices—improved CPU performance, which Plaintiffs expressly admit is of critical importance to them. *See* 2AC ¶¶ 738-44.

       ***Unconscionable conduct (Florida, New Jersey, Ohio, and Texas)***. Although there are minor variations among the relevant tests for unconscionability, the outcome under each test is the same: Plaintiffs' insufficient allegations of omissions or misrepresentations, untethered to any actual decision made by any Named Plaintiff, fail to state a claim for unconscionable conduct, and Plaintiffs have alleged no other conduct that could suffice to state a plausible claim.

       ***Florida***. In Florida, the standard for unconscionability requires both an "absence of meaningful choice" and "unreasonable[] . . . terms." *Coffey v. WCW & Air, Inc.*, 2020 WL 3250744, at *3 (N.D. Fla. Mar. 25, 2020). Plaintiff Schwartz Eye does not allege (much less explain how) it lacked a "meaningful choice" or faced terms that were "unreasonable." *See* 2AC ¶¶ 87-99. In any event, where Schwartz Eye's fraud and unfairness allegations fail, so too should any allegations of unconscionability, as a plaintiff that cannot assert a claim for *unfair* practices under the FDUTPA also cannot state a claim for *unconscionable* practices. *See Rogers v. Cisco Sys., Inc.*, 268 F. Supp. 2d 1305, 1315 n.19 (N.D. Fla. 2003) ("[I]t is difficult to conceive of an 'unconscionable' act or practice that would not also be 'unfair.'").

       ***New Jersey***. While the NJCFA applies to "unconscionable" conduct, N.J. Stat. Ann. § 56:8-2, "New Jersey courts … 'have been careful to constrain the [NJCFA] to fraudulent, deceptive or other similar kind of selling or advertising practices.'" *Slebodnik v. Reynolds & Reynolds Co.*, 2014 WL 6609132, at *5 (D.N.J. Nov. 20, 2014) (quoting *D'Agostino v.*

*Maldonado*, 78 A.3d 527, 540 (N.J. 2013)) (alterations in original).  Because the New Jersey

Named Plaintiffs have failed to plead fraudulent or deceptive conduct, *see supra* pp. 14-29, as

before, they have failed to adequately allege "unconscionable" conduct.  *See Slebodnik*, 2014 WL

6609132, at *10.

   ***Ohio***.  "Unconscionable acts or practices" under the OCSPA are those in which a supplier

"manipulate[es] a consumer's understanding." *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 800

(Ohio 2005).  A "focus" of such a claim is "on whether the consumer lacks the physical or mental

ability to protect himself or herself."  *See Barrett-O'Neill v. LALO, LLC*, 171 F. Supp. 3d 725, 741

(S.D. Ohio 2016); *see also* Ohio Rev. Code Ann. § 1345.03.  The Complaint includes no

allegations that Plaintiff Dunn lacked "the physical or mental ability to protect" herself; to the

contrary, the allegations as to her are materially identical to those of other Named Plaintiffs suing

under statutes that do not even provide a claim for unconscionable conduct.  *Compare, e.g.*, 2AC

¶¶ 223-28 (New York Named Plaintiff), *with* 2AC ¶¶ 336-41 (Dunn).  Nor does the Complaint

include any allegations that would support a claim that Intel "required [Dunn] to enter into a

consumer transaction on terms [Intel] knew were substantially one-sided in favor of the supplier."

Ohio Rev. Code § 1345.03(B)(5); 2AC ¶ 1432 (relying on subsection (B)(5)).

   ***Texas***.  An "unconscionable" practice under Texas law requires more than "mere

unfairness."  *Chastain v. Koonce*, 700 S.W.2d 579, 582 (Tex. 1985).  Instead, to allege an

"unconscionable" practice the plaintiff must allege conduct that "[took] advantage of the lack of

knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."  Tex. Bus.

& Com. Code Ann. § 17.45(5).  "Gross" unfairness—i.e., "glaringly noticeable, flagrant, complete

and unmitigated" unfairness—is an objective standard, and thus suitable for dismissal at the

pleading stage. *Chastain*, 700 S.W.2d at 582-84. As the Complaint fails to state even a claim of "unfairness," it cannot meet this higher bar.

## CONCLUSION

For the foregoing reasons, both California-law claims and all of the state subclass counts identified above should be dismissed with prejudice.

DATED: July 14, 2021.                    Respectfully submitted,


                                         STOEL RIVES LLP


                                         /s/ Steven T. Lovett
                                         Steven T. Lovett, OSB No. 910701
                                         steve.lovett@stoel.com
                                         Rachel C. Lee, OSB No. 102944
                                         rachel.lee@stoel.com
                                         Telephone: 503.224.3380

                                         WILLIAMS & CONNOLLY LLP

                                         Daniel F. Katz (*pro hac vice*)
                                         dkatz@wc.com
                                         David S. Kurtzer-Ellenbogen (*pro hac vice*)
                                         dkurtzer@wc.com
                                         Telephone: 202.434.5000

                                         Attorneys for Defendant Intel Corporation